1998-NMCA-072

960 P.2d 818

**STATE of New Mexico ex rel. Tom UDALL, Attorney General, Plaintiff–Appellant,**

v.

**C.W. CRESSWELL, Jeanne Lutz, William L. Lutz, Jackie Martin and R. Wilson Martin, Defendants–Appellees.**

**No. 17740.**

Court of Appeals of New Mexico.

March 11, 1998.

Certiorari Denied May 20, 1998.

Tom Udall, Attorney General, Frank D. Weissbarth, Assistant Attorney General, William S. Keller, Assistant Attorney General, Santa Fe, for Plaintiff–Appellant.

Ralph Wm. Richards, Richards & Schiller, P.A., Las Cruces, for Defendants–Appellees Jackie Martin & Jeanne Lutz.

Charles W. Cresswell, R. Wilson Martin, William L. Lutz, Las Cruces, for Appellees/pro se.

## OPINION

BOSSON, Judge.

{1} This case involves disputed liability under the 1973 New Mexico Subdivision Act

before it was amended in 1995. *See* NMSA 1978, §§ 47–6–1 to –29 (1973, as amended through 1995). Specifically, we address the question whether a seller, who divides land for the purpose of creating a security interest to finance a sale, escapes responsibility as a "subdivider" under the Act solely because he does not intend thereby to create a subdivision. After analyzing this transaction, as characterized by Defendants and the district court and in light of the public purpose of the Act, we conclude as a matter of law that Defendants created a subdivision under the Act. The district court having concluded to the contrary, we reverse and remand for further proceedings.

BACKGROUND

{2} The Subdivision Act requires that "an area of land within New Mexico, the surface of which has been divided by a subdivider into five or more parcels within three years for the purpose of sale or lease[,]" must be developed to comply with the requirements of the Subdivision Act. Section 47–6–2(I) (1981). Under the Act, those who subdivide the land are required to provide, and pay for, the platting and basic infrastructure needed for a community to survive. *See* §§ 47–6–3 to –14. Without such amenities, communities can become health hazards and a burden on taxpayers. *See generally* Nancy L. Simmons, *Memories and Miracles— Housing the Rural Poor Along the United States–Mexico Border: A Comparative Discussion of Colonia Formation and Remediation in El Paso County, Texas, and Doña Ana County, New Mexico*, 27 N.M.L.Rev. 33, 34 (1997) (observing that "illegal subdivisions without roads or water or sanitation, sold mostly to new immigrants" are commonly referred to as *colonias,* a term first used in Lyndon Baines Johnson Sch. of Pub. Affairs, Univ. of Tex (Austin), Policy Research Project Report No. 18, *Colonias in the Lower Rio Grande Valley of South Texas: A Summary Report* 5 (1977)).

{3} The number of parcels into which land is divided over the course of three years is a pivotal issue. If landowners restrict their land divisions to four or fewer during any three year period, then the Act appears to allow them to avoid much of the heavy responsibility that is placed on a subdivider for creating a "subdivision." However, if the land is divided into five or more parcels, for the purpose of sale or lease, the owner becomes a subdivider, willingly or unwillingly, who must accept responsibility for the improvements and infrastructure that the Act requires as a threshold minimum. It is no surprise that this is not the first time our appellate courts have addressed similar issues, although not the exact issue in the context presented today. *See, e.g., Sandoval County Bd. of Comm'rs v. Ruiz,* 119 N.M. 586, 893 P.2d 482 (Ct.App.1995); *State ex rel. Stratton v. Alto Land & Cattle Co.,* 113 N.M. 276, 824 P.2d 1078 (Ct.App.1991); *State v. Heck,* 112 N.M. 513, 817 P.2d 247 (Ct.App. 1991); *State ex rel. Anaya v. Select Western Lands, Inc.,* 94 N.M. 555, 613 P.2d 425 (Ct. App.1979).

{4} This matter began in 1989. Defendants owned a forty-five acre tract of land that had come into their possession by virtue of their successful practice of law in Doña Ana County. Although they preferred to sell the land intact, they later decided to sell it in parcels, and it is undisputed that three separate sales took place between January 1990 and February 1992, conveying twenty-five acres to three separate buyers. Defendants contracted to sell the remaining twenty acres to Anderson in December 1989. Whether those twenty acres were sold as one parcel or two is the subject of this dispute, and it is the key to deciding whether the community protections of the Subdivision Act apply. If the Anderson transaction created two parcels, "for the purpose of sale or lease," as characterized in the Subdivision Act, then Defendants put themselves in the "five or more" category and are obligated under the Act. If, however, that transaction did not divide the twenty acres into more than one parcel, or if the division was not "for the purpose of sale or lease" within the meaning of the statute, then Defendants remained under the "five or more" ceiling, and avoided the Act. To answer this question, we must examine the details of the transaction with some care.

{5} Before doing so, we set forth our standard of review. We accept the findings of the trial court when supported by

substantial evidence. *See Strata Prod. Co. v. Mercury Exploration Co.*, 1996–NMSC–016, 121 N.M. 622, 627, 916 P.2d 822, 827. However we review the legal conclusions of the court, based upon these facts, de novo. *Id.* Additionally, findings by the trial judge which are induced by an incorrect interpretation of the law cannot stand on appeal. *Garcia v. Mora Painting & Decorating*, 112 N.M. 596, 603, 817 P.2d 1238, 1245 (Ct.App. 1991). We also note that in cases such as this, in which the "evidence bearing on the issue is substantially all documentary," this Court is "as well positioned as the district court to consider the evidence[.]" *Brooks v. Tanner*, 101 N.M. 203, 205, 680 P.2d 343, 345 (1984).

{6} The State's characterization of what occurred is straightforward. Although Anderson contracted with Defendants to buy all twenty acres of land, the contract did not describe one twenty-acre tract but rather two separate, ten-acre parcels, specifically identified as Tract 1 and Tract 2. Under the terms of the contract, Defendants paid for a survey of the twenty acres, showing the property as two, separately-surveyed and - platted, ten-acre tracts. Taxes on the two tracts were treated separately. Under the terms of the contract, Defendants were to pay taxes on both tracts for 1989, but would pay taxes on Tract 2 for 1990 as well. The two tracts were covered by separate title insurance policies, and the policy on Tract 2 was not to issue until Anderson made a separate down payment on Tract 2.

{7} The contract provided for the deed to Tract 1 to be recorded at the time of closing in January 1990, while the recording of the deed for Tract 2 was contingent upon Anderson's making a $7,500 down payment by January 15, 1991. The contract specified that if Anderson failed to make the required payment on Tract 2, he would forfeit only his right to Tract 2. His default would have no effect on ownership of Tract 1 which was protected by a partial release. The financing of Tract 2 was non-recourse, which meant that in the event of default, Defendants could not hold Anderson personally liable but could only regain possession of Tract 2 and resell it to someone else. To the State, the combined effect of the non-recourse nature of the agreement for Tract 2 and the partial release of Tract 1, made it easier for Anderson to default, and thus, it became more probable that the two tracts would end up in the hands of different owners.

{8} In mid-January of 1990, Anderson closed on the sale of Tract 1. He immediately divided Tract 1 into four smaller parcels, selling three and retaining one, thereby treating Tract 1 as one parcel separate from Tract 2 that was being divided within the terms of the Subdivision Act. However, Anderson never took possession of Tract 2 because he defaulted on the additional $7,500 down payment. Instead, on September 18, 1990 (eight months after the closing on Tract 1 and four months before the payment was due on Tract 2), Anderson assigned his interest in Tract 2 to Lopez. Lopez also failed to make the $7,500 payment by the required date. On March 25, 1991, a letter from one Defendant to his colleagues acknowledged that he had negotiated the "[s]ale of 10 acre Shrode tract" to Lopez, which referred to a separate sale of Tract 2. Lopez eventually purchased Tract 2 and subdivided it further. It is undisputed that Tracts 1 and 2 became owned by different people, and thereafter were subdivided further by persons other than Defendants. What began in 1989 as an undivided forty-five acre tract of vacant land owned by local attorneys who were not engaged in the business of creating illegal subdivisions, became by 1995 the site of Las Palmeras, an illegal subdivision of multiple small lot owners lacking adequate platting, infrastructure, and basic amenities. We note that Las Palmeras is one of the principal subjects of the aforementioned law review article on the blight of illegal subdivisions known as colonias that apparently fester in southern Doña Ana County.

{9} In short, the State sees this transaction as one which, from the beginning, created two parcels of ten acres each, and not one of twenty acres. When these two parcels are added to the three undisputed transactions, Defendants created "five or more parcels within three years for the purpose of sale or lease" under the Subdivision Act. The State seeks civil injunctive relief against Defen-

dants which would compel them to acknowledge the consequences of this subdivision and help finance necessary improvements.

{10} Defendants, on the other hand, contend that they did not create nor intend to create a subdivision as defined in the Act. Specifically, Defendants argue that under the facts of this case, the twenty-acre tract was not divided into two "for the purpose of sale or lease," but rather as a convenience to the purchaser, to help him finance the purchase price of all twenty acres. Thus, regardless of what later sellers may have done further down the chain of transactions, Defendants argue that they did not create a subdivision under the Act, and they should not be held responsible for the significant expenditures that attend such activity under the Act.

{11} Defendants are quite adamant in drawing this distinction between creating a division for purpose of sale and a division which is merely part of a seller-financed transaction. Although Defendants would have preferred to sell all twenty acres to Anderson in one conveyance, Anderson apparently only had enough money to close on half. Therefore, at Anderson's request, Defendants structured the transaction so that Anderson could purchase outright what he could then afford, and Defendants would finance the remainder by a non-recourse agreement and retention of a lien on Tract 2. Defendants' motivation for financing the transaction with Anderson in this manner was not to create a subdivision or divide the property, but simply to effect a sale of twenty acres, "since Mr. Anderson did not have sufficient money to pay the total consideration." Without this division for the purpose of financing the sale, there would have been no sale. Alternatively, Defendants claim that even if the financing agreement did divide the land "for the purpose of sale or lease," the two tracts would thereafter merge to form one, because they were sold to a common owner, and thus only one twenty-acre tract was conveyed to Anderson.

DISCUSSION

{12} As outlined above, the State and Defendants disagree over (1) whether a division for the purpose of seller-financing to effect a sale falls within the Act, (2) whether Defendants must have intended to divide the land for the purpose of sale or lease (as opposed to a mere financing convenience) to become an illegal subdivider under the Act, and (3) whether, upon completion of the two sales, they merge into one by virtue of common ownership for purposes of the Subdivision Act.

Division for the Purposes of Seller–Financing

{13} Defendants' distinction that the land was divided for the purpose of seller-financing rather than outright sale finds no support in the text of the Subdivision Act. The Act makes no exception for sales that are seller-financed as opposed to bank-financed or cash transactions. There is no exception for land divisions which are all conveyed to one buyer; the Act does not require separate sales to separate buyers. There can be no serious dispute that this transaction was a "sale or lease," regardless of how it was financed. Therefore, under the 1973 Subdivision Act, as it read when these transactions occurred, the text of the statute would appear to encompass this seller-financed transaction.

■ {14} Defendants point to the 1995 amendment to the Subdivision Act, promulgated long after the matters at issue here, which makes the first reference to seller-financed transactions. Under the 1995 amendment, landowners who divide for the purpose of seller-financing are, for the first time, specifically included in the group that must comply with the Subdivision Act.[1] Relying on *Leyba v. Renger*, 114 N.M. 686, 688, 845 P.2d 780, 782 (1992), Defendants argue that the 1995 amendment to the Act is evidence that the 1973 Act could not have applied to divisions for the purpose of seller-financing, reasoning that the amendment is presumed to change existing law. Although such a presumption exists, an amendment

---

1. NMSA 1978, § 47–6–2(J)(10) (1995) excludes for the first time from the definition of subdivision "the division of land created to provide security for mortgages, liens or deeds of trust; provided that the division of land is not the result of a seller-financed transaction."

may also clarify existing law, rather than change the law. *See Wasko v. New Mexico Dep't of Labor,* 118 N.M. 82, 84–85, 879 P.2d 83, 85–86 (1994).

{15} We agree with the position taken by the State that Section 47–6–2(J)(10), as amended in 1995, changes the law by adding to the list of exemptions from the Act, "the division of land created to provide security for mortgages, liens or deeds of trust[,]" but the amendment only clarifies that portion of the law that retains divisions of land that are "the result of a seller-financed transaction." There is a certain logic to these clarifications. The 1973 Act was concerned about divisions of land that resulted in sales, without apparent regard to how they were financed. Once land was divided as part of a sales transaction, the likelihood of an unregulated subdivision increased. It was at that point that the state or county had to insure the availability of improvements; the state could not wait for the sales all to take place and see how many individuals ended up actually owning individual lots, because by then it could well be too late to compel the necessary improvements. The 1995 amendment simply clarified what had always been the focus of the Act: the number of divisions made when land was sold or leased, regardless of whether the division was made to finance the sale or whether the divided land was sold to one or more buyers.

{16} However, a division for other purposes, such as creating a security interest to obtain a loan unrelated to any sales, might not present the same risk of creating a subdivision, and therefore it is not within the scope of the Act. Whereas a seller is motivated to finance a transaction to make a sale, thereby falling under the Act, a division of land solely to provide security for a loan and a mortgage may have an entirely different purpose independent of financing a sale. It was logical, therefore, for the legislature to decide in 1995 that dividing land on a plat merely to obtain financing for a loan that did not include a sale, might not create the risk of an unregulated subdivision and therefore could reasonably be excluded from the Act.

{17} In Defendants' case, the division of the land was to effect a sale. In the course of that sales transaction, Defendants created two parcels of land where one had been before. That is all the Act appears to require. Seller-financing may be the rationale, and a plausible one in terms of conventional real estate conveyances. Defendants argue that this is proof of a benign intent, and we will shortly discuss the relevance of intent. That question aside, there simply is no exception in the Act for this kind of transaction, regardless of whether it is seller-financed and non-recourse. With the creation of two parcels as part of the Anderson sale, when added to the three other parcels sold within the three-year limit, Defendants fell squarely within both the text and the purpose of the Act.

Intent

{18} At the core of their argument, Defendants believe they did not violate the Act because they did not intend to create two separate parcels within the Anderson sale; they intended only one sale of twenty acres, and that is how it would have turned out if Anderson had completed the transaction. To Defendants, therefore, the language of the Act pertaining to dividing "into five or more parcels … for the purpose of sale or lease" requires an intent to be a subdivider, to divide land for the purpose of selling these divisions separately and thereby creating a subdivision.

{19} Defendants persuaded the trial court that they intended to sell only one, twenty-acre tract as witnessed by the contract of sale with Anderson. The trial court so found, and we honor that finding as supported by substantial evidence. On appeal, Defendants argue that the trial court correctly construed the contract as selling one twenty-acre tract. The trial court also concluded that the contract was ambiguous, and after considering extrinsic evidence, found that "it was the intention of the parties" that there be a single division of land. The court then went on to conclude that in "determining whether or not land has been divided into an illegal subdivision, the Court must look to the acts and intentions of the defendant." We disagree with the trial court as a matter of law to the extent its findings and conclusions

link coverage of the Act to the specific intent of the seller.

**■** {20} In fact, there is no requirement of specific intent. Relying on the Attorney General's Manual,[2] this Court in *Heck* noted that *"the actions* of a subdivider . . . trigger . . . the Act." *Heck*, 112 N.M. at 515, 817 P.2d at 249 (emphasis added). Under the Act, as amended in 1981, intent is specifically required only for the imposition of criminal penalties. *See* § 47–6–27(D) ("A conviction based upon any violation of the New Mexico Subdivision Act requires proof of and a finding of general criminal intent."); *cf.* § 47–6–27 (the Act as amended in 1995 now requires a knowing, intentional, willful material violation for the imposition of criminal penalties). By contrast, Section 47–6–26, authorizes the Attorney General to "seek injunctive relief or bring mandamus to compel compliance with the provisions of [the] act," and makes no reference to intent. Unlike a criminal statute, which presumes an intent requirement in addition to prohibited conduct, *see State v. Powell*, 115 N.M. 188, 190, 848 P.2d 1115, 1117 (Ct.App.1993), this civil regulation—to be enforced in this instance by an injunction—focuses on the prohibited conduct alone. The Attorney General's Manual, cited by this court in *Heck*, states: "It is the manner in which a person subdivides the land that must be scrutinized and that ultimately controls the determination [of whether subdivision has occurred]—not the subdivider's motivation." Attorney General's Manual, *supra*, at 49. Therefore, it is simply not determinative that Defendants intended only to facilitate non-recourse seller-financ-

ing through retention of a lien on half the land and that they did not intend to sell two separate lots or create a subdivision. Defendants may not have intended, or even desired, two separate parcels, but that is what they created, and it was undeniably "for the purpose of sale or lease."

{21} Viewed in the context of its public purpose, the relief afforded by the Act would be hollow indeed if sellers and dividers of land could evade financial responsibility for essential amenities simply by the use of non-recourse seller-financing and benign intentions not to "create" a subdivision. Intended or not, the result to residents and taxpayers is the same, and we presume our legislature was well aware of that possibility when it selected the language of the Act. In *Ruiz*, 119 N.M. at 588–89, 893 P.2d at 484–85, we cited with approval the comments of the Attorney General regarding the purpose of the Subdivision Act that "the intent of the subdivision law was to provide a means for insuring the harmonious development of a municipality and its environs in order to coordinate proposed developments with existing municipal plans." We then observed that in ascertaining the intent of the legislature, we look not only to the language of the statute but the object to be achieved. *Id.* at 589, 893 P.2d at 485. Thus, we read the language of the statute together with its amendments and in the context of its purpose. As this Court has previously stated, the Act requires a focus on conduct and its practical consequences and not on any specific motivation or intent on the part of the person who divides

---

2. Attorney General Paul Bardacke, *Subdividing Land in New Mexico, A Guide for Subdividers, Land Use Administrators, Public Officials and Land Purchasers* (2d ed.1984) (reissuing and supplementing Manual first done in 1980 under Attorney General Jeff Bingaman which was partially based on work performed initially under Attorney General Toney Anaya, with substantial contributions by Assistant Attorneys General Joseph F. Canepa, Janice M. Ahern, and Anita Miller) [hereinafter Attorney General's Manual]. Under the New Mexico Subdivision Act, the Attorney General of New Mexico is granted investigative and specific enforcement power to compel compliance with the requirements of the Act. *See* §§ 47–6–25.1 to –26. Additionally, the Attorney General is charged with the responsibility of receiving all disclosure statements and advertis-

ing and promotional materials. *See* §§ 47–6–17 to –18; Attorney General's Manual, *supra* at 3–4. Thus, the Attorney General's Office has operated as a clearinghouse for information on all state subdivisions governed by the county subdivision laws. Attorney General's Manual, *supra*, at 4. Consistent with its statutory role, the Office of the Attorney General published the Manual "to assist subdividers, land use administrators, public officials, and purchasers who must comply with and are protected by the New Mexico Laws governing subdivisions." This Court has previously relied upon the authority of the Manual in *Heck*, 112 N.M. at 515, 817 P.2d at 249 and in *Alto Land & Cattle Co.* 113 N.M. at 283, 824 P.2d at 1085. Defendants also rely on the Manual in some of their arguments to this Court.

the land. *See Heck,* 112 N.M. at 515, 817 P.2d at 249.

■ {22} We also note that the imposition of subdivision controls is a classic exercise of state police power to preserve the health, safety, and general welfare of the community. *See Select Western,* 94 N.M. at 558, 613 P.2d at 428. Not only do subdivision regulations help insure a safe and healthy place to live, but subdivision regulations also "protect tax revenues and prevent undue disbursements of public funds by limiting the creation of blighted areas." 13 Richard R. Powell & Patrick I. Rohan, *Powell on Real Property* ¶ 873[1][a], at 79D–8 (1997). When illegal subdivisions are created without financial accountability from the subdivider, it is often the taxpayers who are left to fund essential infrastructure. To its credit, our society simply will not tolerate for long the presence of blighted, unregulated areas like the colonias in question, and thus, sooner or later the essential improvements will be built. The legislative question is who will pay for them: the sellers who initiate the chain reaction of lot splits or the innocent taxpayer? The Subdivision Act is the legislative answer to that question. *See* Attorney General's Manual, *supra,* at 7. Simply put, those who profit from dividing and selling unimproved land must bear some of the cost of making that land habitable.

{23} We acknowledge, as urged by Defendants, that in *Select Western,* 94 N.M. at 559–60, 613 P.2d at 429–30, this Court indicated that the Act would not be violated if there was no "predetermined plan" to create a subdivision. We further acknowledge the district court's finding in the instant case that Defendants did not have any such plan. However, as this Court later observed in *Alto Land & Cattle Co.,* "the decision to adopt that test was not concurred in by two judges, and thus was not a decision of this court[.]" 113 N.M. at 279, 824 P.2d at 1081. We emphasize that *Select Western* was a criminal case, and the imposition of criminal penalties under the Act has always required intentional wrongdoing. *See* § 47–6–27(D). We also note that the Court's ruling in *Select Western* prompted amendments to the Act in 1981 to avoid that very intent requirement.

*See* Attorney General's Manual, *supra,* at 133–34. We said as much in *Alto Land & Cattle Co.,* 113 N.M. at 277 n. 2, 824 P.2d at 1079 n. 2 ("The thrust of the 1981 amendments was 'an attempt to eliminate the statutory construction problems encountered in *Select Western.'* "). *See also* Amy Landau, Note, *Definitional Loopholes Limit New Mexico Counties' Authority to Regulate Subdivisions,* 24 Nat. Resources J. 1083, 1091 (1984). Therefore, in interpreting the Act as it has been read since 1981 in the context of civil injunctive relief, we think it is clear that much of *Select Western* no longer applies, and we hold that it does not impede the application of civil remedies under the Act to Defendants regardless of their intentions. We express no opinion on what, if anything, of *Select Western* remains as a condition for criminal liability under the Act.

{24} Defendants also point out that despite the 1981 amendments, this Court applied the *Select Western* standard in *Alto Land & Cattle Co.,* 113 N.M. at 279, 824 P.2d at 1081, stating that the creation of a subdivision required "five lots ... [to be] sold in accordance with a predetermined plan." However, the *Alto Land & Cattle Co.* court applied the *Select Western* standard, not because the rule had been adopted by this Court as appropriate for the Act as amended in 1981, but because the parties themselves had agreed to apply that test. *Alto Land & Cattle Co.,* 113 N.M. at 279, 824 P.2d at 1081. Most of the transactions involved in *Alto Land & Cattle Co.* had taken place before the 1981 amendments, *id.* at 277–79, 824 P.2d at 1079–81, and thus, the application of the pre-1981 standard of *Select Western* was appropriate in that particular instance. In *Ruiz,* 119 N.M. at 588–89, 893 P.2d at 484–85, this Court did not consider the intent of a landowner who created a mobile home park determinative of whether he intended thereby to create a subdivision. This is consistent with *Heck,* in which we stressed, citing the Attorney General's Manual, that "the actions of the subdivider" bring the subdivider within the scope of the Act. 112 N.M. at 515, 817 P.2d at 249. Therefore, contrary to Defendants' contentions, we are not persuaded that the previous decisions of this Court require a

different result from that which we reach today.

{25} Our disposition of this issue affects how we review certain of the trial court's findings that Defendants urge us to accept. In Findings 22 and 27, the court found that Defendants had made only four divisions in the forty-five acre tract for the purpose of sale or lease. To the extent that this is based on evidence of Defendants' intent, we have no quarrel with this finding. However, as we have made clear in this opinion, we hold as a matter of law, based on our interpretation of the Subdivision Act, that Defendants made five divisions of this tract for the purpose of sale or lease.

Merger

{26} In an ironic turnabout, Defendants rely upon the Attorney General's Manual for a different claim. They argue that even if they did sell two parcels to Anderson, these parcels would merge into one because they were sold to a common owner. Here again, the text of the Subdivision Act contains no such exemption, and therefore we approach Defendants' contention with some skepticism.

{27} The discussion of merger in the Attorney General's Manual is contained in a section entitled, "Illegal Subterfuges Designed to Avoid the Subdivision Laws." Attorney General's Manual, *supra*, at 47. The Manual's discussion of merger of land under common ownership focuses on the actions of the subdivider and ways to *include* those actions within the Act, not have them *excluded* as Defendants propose. Merger occurs, for example, if an owner of multiple parcels tries to divide each of those parcels into fewer than five parcels, thereby trying to avoid the Act and create multiple land divisions without providing any infrastructure. *Id.* at 58–59. The Attorney General's Manual states that multiple parcels owned by a single landowner "merge" when that owner subdivides the land further. The Act looks to the totality of the divisions instead of each individual conveyance. Thus, an owner of four parcels could convey no more than four parcels, not four times four, without coming within the scope of the Subdivision Act. The Manual emphatically does not permit what

Defendants contend: a merger by virtue of common ownership to avoid the Act. We are not persuaded by Defendants' argument on this point.

Mootness

■ {28} Finally, relying on *Carter v. City of Las Cruces*, 1996–NMCA–047, ¶¶ 8–10, 121 N.M. 580, 915 P.2d 336 and *Mowrer v. Rusk*, 95 N.M. 48, 51–52, 618 P.2d 886, 889–90 (1980), Defendants argue that the claim against them is moot because both the county and the State have settled with Lopez. We disagree. An action for injunctive relief is moot only if there is no reasonable expectation that the alleged violation will recur and if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Alto Land & Cattle Co.*, 113 N.M. at 287, 824 P.2d at 1089. Lopez was initially a defendant in this action. Despite the settlement with him, there has been no showing that Lopez has completely and irrevocably eradicated the effects of the alleged violation. The truth would appear to be to the contrary. Although the settlement required Lopez to comply with the Subdivision Act by putting in infrastructure, the State represents to us that this has not occurred, which is the very reason the State is looking to these Defendants for financial contribution.

■ {29} Additionally, the settlement of the State and the county with Lopez and the county's dismissal of its action against Defendants does not prevent the State from pursuing this case against Defendants separately from the county. The record does not suggest that the county's dismissal of its action against Defendants indicates a disapproval of the State's action. In *Alto Land & Cattle Co.*, 113 N.M. at 286, 824 P.2d at 1088, quite the opposite was the case. There the record was clear that the county dismissed its complaint because the state's action raised the same issues. *Id.* It is quite possible that the same considerations played a part in the county's decision to dismiss its complaint here; there would be little gain for the county from such a duplication of effort. We will not read into the county's dismissal of its action against Defendants a desire that the

State should do the same when the documents do not so reflect, nor do we hold that should a case arise where the county and state have conflicting views, the will of the Attorney General will always govern the course of proceedings. *See City of Santa Rosa v. Jaramillo*, 85 N.M. 747, 750, 517 P.2d 69, 72 (1973) (quoting *First Thrift & Loan Ass'n v. State*, 62 N.M. 61, 70, 304 P.2d 582, 588 (1956)) ("'We are not bound by them [Attorney General opinions] in any event, giving them such weight only as we deem they merit and no more. If we think them right, we follow and approve, and if convinced they are wrong, *** we reject and decline to feel ourselves bound.'").

{30} The State and the county are separate parties, each with independent enforcement authority under the Subdivision Act. *See* § 47–6–26; *Alto Land & Cattle Co.*, 113 N.M. at 285–86, 824 P.2d at 1087–88. Moreover, in this particular case although the State and the county were independent parties in this lawsuit, they appear to have been cooperating with each other. The settlement between the county, the State, and Lopez expressly provided that in the event the State ultimately prevailed on its money claims against Defendants, the parties would agree to negotiate whether Lopez would be entitled to any offset or contribution in recognition of funds he may expend on the same improvements.

{31} Thus, Defendants offer an alternative source of financing to provide the necessary infrastructure in Las Palmeras. The State in this case is enforcing a statutory scheme against Defendants for violations separate from those committed by Lopez, and in doing so is protecting a broad public interest. The trial court even entered a pre-trial order severing the trial of Lopez from that of Defendants. Lopez and Defendants are separate parties who have violated the Subdivision Act in different ways, and those violations have not yet been remedied. The State's claim against Defendants is not moot.

CONCLUSION

{32} Because Defendants divided the twenty-acre parcel into two ten-acre parcels in December 1989 for the purpose of sale, they made a total of five divisions of their property within three years for the purpose of sale. Thus, we hold that they fall within the Subdivision Act and are subject to its remedies. Accordingly, we reverse and remand this case to the district court for further proceedings consistent with this opinion in regard to what remedy or remedies may be appropriate under the circumstances.

{33} **IS SO ORDERED.**

ALARID and BUSTAMANTE, JJ., concur.

