2003-NMSC-016

72 P.3d 608

Michael A. McGARRY, as trustee of the Christine Kurtz McGarry Trust, the Living Trust of Mary Margaret Frebies, and the Michael A. McGarry Living Trust, Plaintiff–Respondent,

v.

Fred J. SCOTT, Steve R. Barela, James H. Meisner, William R. Dawson, Jr., Clara B. Chicharello, Board of County Commissioners of the County of Cibola, New Mexico, et al., Defendants–Petitioners.

No. 27,294.

Supreme Court of New Mexico.

June 16, 2003.

Daniel J. Macke, Kevin M. Brown, Albuquerque, NM, for Petitioners.

William G. Stripp, Ramah, NM, for Respondent.

## OPINION

SERNA, Justice.

{1} Plaintiff–Respondent Michael McGarry is the trustee for lots held in three living trusts for property in the Timberlake subdivision in McKinley and Cibola counties. Plaintiff sued Defendants–Petitioners McKinley and Cibola counties, among others, to compel road maintenance. This Court granted certiorari to determine whether the New Mexico Subdivision Act, NMSA 1978, §§ 47–6–1 to –29 (1973, as amended through 1999) (Subdivision Act), and this Court's opinion in *State ex rel. Shelton v. Board of Commissioners*, 49 N.M. 218, 161 P.2d 212 (1945), require that Defendants accept road maintenance or whether Plaintiff can impose maintenance obligations through public use under the theories of implied dedication or prescription. We conclude that the Subdivision Act requires that counties must accept roads

for maintenance and that there is no evidence of acceptance in this case. Thus, we affirm the trial court's grant of summary judgment for Defendants.

## I.  Facts and Background

{2} The Timberlake subdivision is comprised of four subdivisions that were created between 1978 and 1981. The covenants for the subdivisions were filed in Valencia County between those years. Cibola County was formed from Valencia County in 1981. The Timberlake subdivision is located in both Cibola and McKinley counties. The subdivision developers constructed roads that did not meet county standards for maintenance and retained maintenance responsibility of the roads within the subdivision through at least 1991. Through a settlement agreement, McKinley County agreed to bring several miles of Timberlake Road up to Class C status and to provide gravel for the road.[1] The agreement stated that no other roads would be accepted by McKinley County unless the roads were improved to Class C Status. Defendants provided evidence that, in 1991, at least eighty percent of the Timberlake Ranch lots were sold and, as a result, following a vote by lot owners, the Timberlake Ranch Landowners' Association assumed responsibility for road maintenance. The trusts represented by Plaintiff acquired lots thirty and thirty-one in 1991, lot thirty-two in 1993, and lot seven in 1998.

{3} In 1999, Plaintiff filed a declaratory judgment action against Defendants, the developers, and the Timberlake Ranch Landowners' Association, among others, to require the construction and maintenance of the roads "throughout the four subdivisions." Defendants filed motions for summary judgment, arguing that they had no obligation

---

1.  McKinley County agreed to "accept responsibility for upgrading to a Class 'C' road status that portion of Timberlake Road going from the County line at the fire station all the way north to the end of the subdivision, which is approximately [four] miles in length.... When that four mile stretch is upgraded to Class 'C' road status, McKinley County will accept the four mile stretch of road for maintenance on the understanding that the County and Timberlake Ranch Landowners Association ... will maintain the

road with the County providing gravel annually and TRLA using the grader on the road...." The agreement further stated that "[n]one of the lateral roads in the Timberlake Ranch subdivision in McKinley County will be accepted as County roads unless they are improved to Class 'C' road status. Whether or not the lateral roads should be improved from their present condition and how much they should be improved is a matter of disagreement among lot owners."

**34**

because they never accepted the subject roads for maintenance. Defendants relied primarily on the Subdivision Act. Plaintiff offered extrinsic evidence in the form of affidavits challenging Defendants' legal argument that the roads had not been accepted. Plaintiff did not refute that Defendants never formally accepted the roads for maintenance, but argued instead that acceptance could be established through public use alone.

{4} The district court granted Defendants' motion for summary judgment. Plaintiff's only argument regarding the Subdivision Act is that the district court did not find that the roads were subdivision roads, although Plaintiff's complaints note that the land in question is part of a subdivision. The district court did not reference the Subdivision Act by name or statute citation in its decision; however, as noted by Defendants, the issue presented in their motion for summary judgment was the applicability of the Subdivision Act. The district court's decision recognized that the roads and land in dispute are within four subdivisions constituting the Timberlake subdivision, and that the covenants for the subdivisions were filed in McKinley, Valencia, and Cibola counties. The district court specifically decided that, "[w]hile the roads were dedicated to the Counties, the Defendant Counties have not accepted [the roads] for maintenance." We believe that Defendants' argument regarding the Subdivision Act formed the basis of the district court's decision. The Court of Appeals reversed in a memorandum opinion, holding that significant public use of the roads may render them "public highways" under NMSA 1978, § 67-2-2 (1905) under a theory of implied acceptance or prescriptive acquisition. *McGarry v. Scott*, NMCA 21,774, slip op. at 3–6 (Nov. 13, 2001), *cert. granted*, No. 27,294, 131 N.M. 738, 42 P.3d 843 (2002).

## II. Discussion

{5} A trial court may grant summary judgment "if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Roth v. Thompson*, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992). This Court reviews the trial court's summary judgment ruling de novo. *See Phoenix Indem. Ins. Co. v. Pulis*, 2000–NMSC–023, ¶ 6, 129 N.M. 395, 9 P.3d 639.

{6} Defendants argue that the Subdivision Act requires acceptance by the Board of County Commissioners prior to a commitment for road maintenance. Defendants also argue that *Shelton* does not allow county acceptance solely through public use. Lastly, Defendants argue that the Court of Appeals' opinion will have undesirable effects, such as the imposition of significant public obligations on counties based on acceptance by public use rather than formal statutory acceptance. Plaintiff argues that the fact that the road is used for mail delivery, a school bus route, and by members of the public is enough to establish that Defendants must improve and maintain the roads. The record does not clearly reflect which roads were at issue, and the parties continue to disagree on appeal. As Defendants note, Plaintiff's complaint requested that the trial court order that McKinley County, "Cibola County, or the Timberlake developers and salespersons, or all of them, have the obligation to construct and maintain Class A roads throughout the four subdivisions." Defendants agree that, since 1998, they have maintained and certified several miles of the main road through the subdivision. Based on Plaintiff's complaint and the parties' agreement that Defendants are already maintaining part of the main road, we conclude that the subdivision roads at issue are all roads throughout the subdivision except for the portion McKinley County currently maintains. With respect to these roads at issue, we hold that the Subdivision Act requires formal county acceptance to obligate the counties for road maintenance and that such acceptance cannot be satisfied through the common law doctrines of prescriptive acquisition or implied dedication.

{7} The property at issue constitutes a county subdivision and thus is subject to the Subdivision Act. *See* NMSA 1978, § 47-6-2(J) (1996) (defining "subdivision" in part as the "division of a surface area of land, including land within a previously approved subdivision, into two or more parcels for the purpose of sale, lease or other conveyance or

for building development" not within the boundaries of a municipality); NMSA 1978, § 47–6–4 (1996) ("Every final plat submitted to the county clerk shall be accompanied by an affidavit of the owner and subdivider or their authorized agents stating whether or not the proposed subdivision lies within the subdivision regulation jurisdiction of the county."); *Lorentzen v. Smith*, 2000–NMCA–067, ¶ 7, 129 N.M. 278, 5 P.3d 1082 (noting that the Subdivision Act applies to any subdivision as defined by the Act); *State v. Heck*, 112 N.M. 513, 515, 817 P.2d 247, 249 (Ct.App. 1991) ("We note that the actions of a subdivider rather than divisions of the land itself trigger the protections of the [Subdivision] Act."); *Gabaldon v. Sanchez*, 92 N.M. 224, 226, 585 P.2d 1105, 1107 (Ct.App.1978) (noting that subdivided property "is within the meaning of the New Mexico Subdivision Act and, therefore, controlled by that statute"). "The Subdivision Act requires that [subdivided property] . . . must be developed to comply with the requirements of the Subdivision Act." *State ex rel. Udall v. Cresswell*, 1998 NMCA 072, ¶ 2, 125 N.M. 276, 960 P.2d 818.

▪ {8} Our Legislature first addressed subdivision planning in 1884, later authorizing municipalities to plan and regulate land use with zoning powers as early as 1927, granting power to create a municipal planning commission in 1947, and granting counties zoning authority in 1959, with greater authority given in 1967. Joseph F. Canepa & Janice M. Ahern, Office of the Attorney Gen. of N.M., *Subdividing Land in New Mexico: A Guide for Subdividers, Land Use Administrators, Public Officials and Land Purchasers* 13 (2d ed.1984) (contributions by Anita Miller; prepared under Paul Bardacke). *See generally Cresswell*, 1998–NMCA–072, ¶ 20 & n. 2, 125 N.M. 276, 960 P.2d 818 (noting that our courts have previously relied upon this guide). In 1973, the Legislature granted counties broad regulatory power with the enactment of the Subdivision Act, and "the state of New Mexico committed itself to a system of managed growth to anticipate and plan for land subdivision." Canepa & Ahern, *supra*, at 14–16. The population of New Mexico experienced a significant increase between the years 1960 and 1980, from 951,023 to 1,266,600 people. *Id.* at 9. Population and growth issues

> have placed a large burden upon city and county governments as well as the taxpayers. Bankrupt or irresponsible developers have failed to provide the roads and water and sewage systems promised to purchasers of lots in subdivisions. The counties have been faced with the prospect of providing those services and paying for them with taxpayers' money.

*Id.* at 11. The Subdivision Act is a legislative response to such issues that grants the power and authority to counties to approve or disapprove subdivisions, as well as to promulgate regulations for roads and utilities. *Id.* at 15–16. The Act authorizes the counties to adopt regulations regarding water use, waste disposal, utilities, "sufficient and adequate roads," and "any other matter" "necessary to promote the health, safety, or the general welfare." NMSA 1978, § 47–6–9 (1996).

> The imposition of subdivision controls and standards is an exercise of the police power of the state for the purpose of preserving the health, safety and general welfare of the community. As with similar legislation enacted by other states, the purpose of the New Mexico subdivision laws is to ensure that planned development is regulated by state, county, and municipal authorities so that subdivided land areas do not become a burden on the taxpayers of the state.

Canepa & Ahern, *supra*, at 7 (endnote omitted).

▪ {9} The subdivisions in the present case were created between 1978 and 1981. At that time, the Subdivision Act directed that "[a]pproval of a plat by the board of county commissioners dedicates the land designated on the plat for public use. Dedicated land is public property, and the fee vests in the county if the dedicated land lies outside the boundaries of a municipality." NMSA 1978, § 47–6–5 (1973, prior to 1981 & 1996 amendments). The approval of such dedicated land is discretionary; the county commissioners may, "if in their opinion, the public good requires it," declare a road to be a public highway after the owners of the land through which it passes dedicate it for public

use. NMSA 1978, § 67–5–20 (1905). Thus, the county has the discretion to accept or reject a road for dedication. The disclosure section of the Subdivision Act, NMSA 1978, § 47–6–17(B)(18) (1973, prior to 1996 amendment), provided that written disclosure to prospective buyers must include "a statement disclosing whether or not the roads within the subdivision *have been accepted for maintenance by the county*." [2] (emphasis added). Another disclosure provision deems a sale or lease of a subdivided parcel of land unlawful until there has been disclosure of "the fact that any street or road facilities have not been accepted for maintenance by a governmental agency when such is the case." NMSA 1978, § 47–5–4 (1963).

Both the 1963 Land Subdivision Act and the New Mexico Subdivision Act specifically state that approval of a plat by the Board of County Commissioners dedicates the land designated for public use to the county and fee vests automatically in the county. However, the dedication of streets and roads for public use does not automatically result in acceptance of roads for maintenance by the county. Both Acts require clear disclosure to purchasers as to whether the county, the subdivider, or the purchasers are required to maintain the roads. Thus, these Acts provide for dual approval: (1) acceptance of the dedication of land for public use, and (2) acceptance of maintenance responsibility for the dedicated land.

Canepa & Ahern, *supra*, at 75–76 (citations and endnotes omitted). Section 47–5–4, as well as the version of Section 47–6–17(B)(18) in effect when the subdivision was created, specifically requires disclosure to the buyer regarding whether the county has accepted the subdivision roads for maintenance, confirming Defendants' argument that the Legislature intended county acceptance of roads for maintenance to be a prerequisite to a county obligation to maintain the subdivision roads.

{10} The 1981 and 1995 amendments to the Subdivision Act further "clarif[y] that

dedication of roads for public use *does not* automatically impose a corresponding duty upon the county to maintain the roads." Canepa & Ahern, *supra*, at 77. The 1981 amendment to Section 47–6–5 specified the requirements for the subdivider and additionally clarified that the county must accept the responsibility for road maintenance: "The plat shall clearly state that the subdivider has agreed to build the roads within the subdivision in full conformance with the requirements of the county subdivision regulations. Upon full conformance with the county road construction standards, the roads may be accepted for maintenance by the county." The current version, NMSA 1978, § 47–6–5 (1996), provides:

The final plat shall contain a certificate stating that the board of county commissioners accepted, accepted subject to improvement or rejected, on behalf of the public, any land offered for dedication for public use in conformity with the terms of the offer of dedication. Upon full conformance with the county road construction standards, the roads may be accepted for maintenance by the county. Acceptance of offers of dedication on a final plat shall not be effective until the final plat is filed in the office of the county clerk or a resolution of acceptance by the board of county commissioners is filed in such office.

"The county now must provide by separate regulations, not only specifications for roads for all types of subdivisions, but also provide procedures for acceptance of roads for maintenance by the county as part of a separate and distinct county decision and action." Canepa & Ahern, *supra*, at 77. Although more explicit in these recent amendments, the statutes in effect when the Timberlake subdivisions were formed thus contain the specific guidelines for acceptance of roads for county maintenance: dedication and acceptance of land for public use and county acceptance of maintenance obligations.

■ {11} "[D]edication is not synonymous with acceptance by the county for mainte-

---

**2.** The current version of this statute, NMSA 1978, § 47–6–17(B)(18) (1996), provides that written disclosure must include "a statement disclosing whether the roads and other improve-

ments within the subdivision will be maintained by the county, the subdivider or an association of lot owners and what measures have been taken to ensure that maintenance will take place."

nance. The subdivider, or any succeeding entity[,] must petition the county for maintenance." Canepa & Ahern, *supra,* at 142. Defendants argue that the undisputed facts demonstrate that necessary conditions of the Subdivision Act were not met in the present case. We agree. Plaintiff did not respond to Defendants' reliance on or arguments pertaining to the Subdivision Act, and Plaintiff does not challenge applicability of the Act to the Timberlake subdivision. "Express acceptance would be found if the county has formally accepted maintenance responsibility." *Id.* at 76. Plaintiff failed to demonstrate that the counties accepted maintenance responsibility for any roads beyond McKinley County's acceptance of maintenance of a few miles of the Timberland Road. The Subdivision Act's disclosure provision in effect at the time the subdivisions were created required subdividers to provide prospective purchasers a statement as to "whether or not the roads within the subdivision have been accepted for maintenance by the county." Section 47–6–17(B)(18); *accord* Canepa & Ahern, *supra,* at 78 ("Full disclosure must be made . . . that no roads have been dedicated to the county and that responsibility for maintenance of private roads rests with either the subdivider or the purchasers."). The disclosure statements in the present case clearly indicate that the counties had not accepted the roads for maintenance. Cibola County Defs.' Mem. in Support of Mot. for Summ. J., Ex. A ("Roads within subdivision have not been accepted by the . . . County. . . . Roads will be maintained by subdivider until a Homeowners Association is formed or 50% of subdivision is sold."); Ex. C ("It is the intention of the subdivider to maintain and develop all roads. At the present time the roads will not be maintained by McKinley County. At some future point in time the subdivider may propose to dedicate the roads for public use and at such time would ask the county to begin maintenance of the roads. Prior to such dedication and maintenance by the County and acceptance by the County Commission the roads would need to be brought up to the standards then acceptable to the then County Commission."); Ex. E ("[The developers] are presently responsible for the maintenance of the roads and [the buyers] will not be charged a road maintenance fee by [the developers]. [The developers] have not yet determined whether the roads will be conveyed to either Valencia or McKinley Counties and the roads are not being constructed in accordance with either county or state specifications. When the subdivision is [eighty percent] sold out, the property owners in the subdivision will be given the option of having the roads brought up to county standards for maintenance by county agencies, or taking over the management of the roads through the property owners['] association, or having the developer continue the maintenance of the roads."); Ex. F ("The Timberlake Ranch Landowners' Association is responsible for maintaining the roads. The cost to lot owners for maintenance of the roads is included in the annual assessment of The Timberlake Ranch Landowners' Association. . . .").

{12} The Court of Appeals also did not address the Subdivision Act in its memorandum opinion, despite the fact that Defendants based their arguments upon the Act in their motions for summary judgment to the district court as well as in their motion for rehearing to the Court of Appeals. Instead, the Court of Appeals relied upon NMSA 1978, § 67–2–1 (1953), which provides:

All roads and highways, except private roads, established in pursuance of any law of New Mexico, and roads dedicated to public use, that have not been vacated or abandoned, and such other roads as are recognized and maintained by the corporate authorities of any county in New Mexico, are hereby declared to be public highways.

*McGarry,* NMCA 21,774, slip op. at 3. "All public highways, except such as are owned and operated by private corporations, . . . shall be maintained and kept in repair by the respective counties in which they are located." Section 67–2–2. The Court of Appeals concluded that use alone "is capable, under a theory of implied acceptance or prescriptive acquisition, of rendering the roads 'public highways' within the meaning of Section 67–2–1." *McGarry,* NMCA 21,774, slip op. at 5. The Court of Appeals concluded that Plaintiff raised a genuine issue of material fact as to

whether the roads were public highways, which precluded summary judgment. *Id.* at 7. We disagree and conclude, as discussed below, that the Subdivision Act is more specific than these general statutes and thus the Act applies to the present case. We also conclude that the common law theories of implied acceptance and prescriptive acquisition are inappropriate for determination of county maintenance of subdivision roads when the Subdivision Act is applicable.

{13} In *State v. Cleve,* 1999–NMSC–017, ¶ 17, 127 N.M. 240, 980 P.2d 23, this Court determined:

> As a rule of statutory construction in determining legislative intent, where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.

(Quoted authority and alteration omitted.) Defendants argue that because the Subdivision Act is more specific, it would control over the more general statutes relied upon by the Court of Appeals and Plaintiffs. We agree.

> This rule in effect treats the special law as an exception to the general law because the Legislature is presumed not to have intended a conflict between two of its statutes and because the Legislature's attention is more particularly directed to the relevant subject matter in deliberating upon the special law.

*Id.* The Subdivision Act deals with the subject of subdivision roads and county road maintenance in a much more detailed way than the statutes relied upon by the Court of Appeals.

{14} We also disagree with reliance on common law principles to render the roads at issue public highways for purposes of governmental maintenance responsibilities. Both parties argue that *Shelton* supports their respective positions. In *Shelton,* this Court addressed whether an individual could compel county commissioners to remove obstructions, including a house, from land asserted to be part of a public highway so that the public could pass freely on the "public highway." *Shelton,* 49 N.M. at 219, 161 P.2d at 212. The Court discussed the predecessor statutes to Section 67–2–1 and Section 67–2–2, as well as the predecessor statutes to the Subdivision Act. *Id.* at 220, 222, 161 P.2d at 213–15. The Court noted that if the "[c]ommissioners owed to the public a clear legal duty to compel the removal of the obstructions alleged to have been placed in the highway, then the action against it may be maintained by appellant." *Id.* at 221, 161 P.2d at 214. The Court, after quoting the subdivision statute, concluded that the dedicator could bind himself through proper dedication, but that the dedication could not so bind the county: "While the fact that the land in question was part of a street dedicated to the use of the public by its owner, may have bound the dedicator, it did not bind the county of Bernalillo unless and until the dedication was accepted by the Board of County Commissioners of that county." *Id.* at 223, 161 P.2d at 215. We held that there must be acceptance by the county: "No one can thrust a grant upon another without his [or her] assent." *Id.* at 224, 161 P.2d at 215 (quoted authority and quotation marks omitted). The Court reasoned that "an offer of land for [a public way] is often—and very properly—declined, for the reason that no such way as the one proposed is needed, and by the acceptance the public would be burdened with obligations without corresponding benefits." *Id.* (quoted authority and quotation marks omitted). This Court concluded that "[t]here is neither evidence nor finding that the offered dedication was ever accepted by the board of county commissioners of Bernalillo County, and the burden rested upon the appellant to show such acceptance." *Id.* We rejected the argument "that acceptance by the county need not be by resolution or in writing, but may be implied from acts" and held that "there must be either an express or implied acceptance on the part of the board of county commissioners to render the county liable to the maintenance of the highway; and there is no finding or evidence of either." *Id.* at 224, 161 P.2d at 216.

{15} Similarly, the burden is on Plaintiff to show acceptance by Defendants themselves. In the present case, the Subdivision Act requires that there must be acceptance of road maintenance obligations by the board of county commissioners, and Plaintiff did not demonstrate that Defendants formally accepted maintenance responsibility. Instead, Plaintiff argues that such acceptance can be implied through use by the public in addition to the fact that there are postal and school bus services on the roads in question, based on theories of prescriptive easement and implied dedication. We reject this argument and distinguish between these specific common law theories of prescriptive easement and implied dedication and implied acceptance by the actions of the board of county commissioners for road maintenance.

{16} While it might be possible to show implied acceptance of maintenance obligations by actions of Defendants, Plaintiff did not show that Defendants performed any actions which would constitute implied acceptance; public use and postal and bus services are inadequate to create road construction and maintenance obligations on the counties. *See* Canepa & Ahern, *supra,* at 76 ("Generally, periodic maintenance on an irregular basis of a road will not, by itself, establish implied acceptance of full maintenance responsibility by the county. However, a county should consider carefully the fact that regular maintenance may operate as an implied acceptance of maintenance responsibility and, therefore, may desire to avoid accepting what in the future could be an unanticipated economic burden.") (endnote omitted). This Court has rejected acts more closely tied to the governmental authority for implied acceptance of dedication. *Watson v. City of Albuquerque,* 76 N.M. 566, 569, 417 P.2d 54, 56 (1966). In *Watson,* the plaintiffs, property owners, sought to declare a public right of way, or easement, to be a public street. *Id.* at 567–68, 417 P.2d at 55. The plaintiffs argued that the city's actions with respect to the right of way, including irregular maintenance, garbage collection, and the fact that the city did not assess taxes for the land, as well as placement of utility poles by public utility companies, constituted dominion and control so as to be acceptance by the city for

dedication. 76 N.M. at 568–69, 417 P.2d at 55–56. This Court rejected all of these grounds for establishing acceptance by the city, concluding that

> [a]t common law, there must be both an offer of dedication by the owner and an acceptance by the city to constitute complete dedication. It is well settled that an owner of property cannot, simply by making a plat, impose the burden of dedication upon a municipality. The offer of dedication cannot bind the city until it has been accepted. The city's liability by acceptance arises only when it has done some act which unequivocally shows an intent to assume jurisdiction over the property dedicated.

*Id.* at 568–69, 417 P.2d at 55 (citations omitted). *Watson,* unlike the cases relied upon by Plaintiff, addressed street dedication rather than simply right of way, or easements, and held that a municipality's liability which arises from dedication must be based on more than the acts shown in that case. Similarly, we conclude that public use of a road, school bus routes, and postal service do not establish an acceptance by Defendants of road maintenance obligations; such acts do not unequivocally show intent to assume jurisdiction, particularly in the face of filed disclosure forms which clearly show county rejection of maintenance obligations. *See* Canepa & Ahern, *supra,* at 197 ("Temporary or emergency maintenance by the county does not constitute an implied acceptance of maintenance by the county."). In other words, we cannot contemplate implying acceptance of maintenance by Defendants based on the public use and postal or bus services when Defendants have expressly denied maintenance responsibility.

{17} The Court of Appeals accepted Plaintiff's argument based on prescription or implied dedication, relying on *Luevano v. Maestas,* 117 N.M. 580, 874 P.2d 788 (Ct. App.1994), *Village of Capitan v. Kaywood,* 96 N.M. 524, 632 P.2d 1162 (1981), and *Lovelace v. Hightower,* 50 N.M. 50, 168 P.2d 864 (1946). *McGarry,* NMCA 21,774, slip op. at 3–6. As discussed below, these cases involve the recognition of a public right of way through a public prescriptive easement or

implied dedication. However, none of these cases created maintenance obligations on a county based on prescription or implied dedication through public use.

{18} *Luevano* involved a claim of a public right to use a road that extended between the plaintiffs' property and the defendants' property by implied dedication or prescription. *Luevano,* 117 N.M. at 582, 874 P.2d at 790. The county maintained the road between 1974 and 1987, and the plaintiffs objected to the maintenance in 1987, resulting in county maintenance of the road except for the portion that abutted the plaintiffs' property. *Id.* at 583, 874 P.2d at 791. The Court of Appeals, in *Luevano,* noted that there was evidence in the record that the road in question was shown in public records to be a public road, that the county maintained the road, and that the road had a reputation as public. *Id.* at 584–85, 874 P.2d at 792–93. The Court of Appeals recognized that "[t]he purpose of the principle of common law dedication is to provide a mechanism for an intentional appropriation or donation of land by its owner for some proper public use," and that the owner's intent need not be express but may be implied by acquiescence to public use. *Id.* at 586, 874 P.2d at 794. *Luevano* concluded that evidence of county maintenance and improvement, public reliance, and public benefit resulted in a showing of implied dedication or prescription for a public right of way. *Id.* at 587, 874 P.2d at 795. *Luevano's* discussion of implied dedication and prescription addressed a public right of way, however, not affirmative duties of road maintenance flowing from public use. Thus, *Luevano* is not authority supporting Plaintiff's attempt to transfer the burden of road maintenance to Defendants. Further, the Court of Appeals noted in *Luevano* that "[i]n the absence of a statute more directly on point . . . the common law doctrine of implied dedication provides an adequate alternative" for disputes "between neighbors over use of a road." *Id.* at 588, 874 P.2d at 796. In the present case, however, Defendants have presented this Court with statutes directly on point; thus, reliance on common law doctrines of implied dedication or prescription is inappropriate.

{19} Similarly, in both *Kaywood,* 96 N.M. at 525, 632 P.2d at 1163, and *Lovelace,* 50 N.M. at 52, 168 P.2d at 865, this Court addressed public right of way by prescriptive easement or implied dedication. Neither opinion considered whether a county has an affirmative duty to maintain roads based on public use. Defendants argue that "implied acceptance is best understood as a shield and not a sword," "to prevent others from denying [the public] use or access, but not as 'swords' against a public entity for purposes of imposing public obligations." We agree. Appellate courts have applied these theories in the context of a public right of way, but even setting aside the Subdivision Act, Plaintiff provides no authority for extending the theories to create public maintenance obligations for the benefit of private landowners based on mail and school bus service and activity by members of the general public. As discussed above, this Court has rejected similar arguments. *See Watson,* 76 N.M. at 568–69, 417 P.2d at 55–56.

{20} "We construe the [Subdivision] Act to give effect to the plain meaning of the legislation, and to avoid rendering any part of the legislation without meaning or effect." *Heck,* 112 N.M. at 515, 817 P.2d at 249 (citation omitted). To extend common law principles of implied dedication or prescription to the present case would render sections of the Subdivision Act without meaning or effect. *See C.F.T. Dev., LLC v. Bd. of County Comm'rs,* 2001–NMCA–069, ¶ 23, 130 N.M. 775, 32 P.3d 784 ("The Subdivision Act envisions, and indeed requires, that each county fashion its own regulations governing the development of subdivisions within its jurisdiction."), *overruled on other grounds by Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,* 2003–NMSC–005, ¶ 16, 133 N.M. 97, 61 P.3d 806.

{21} Plaintiff argues that a landowner has no duty to maintain a "public road," relying on *Dyer v. Compere,* 41 N.M. 716, 720, 73 P.2d 1356, 1359 (1937), which noted that "[t]he owner of the servient estate is under no obligation, in the absence of special agreement, to repair or maintain the way, the rule being that he [or she] who uses the easement must maintain it in proper condition or suffer

the resulting inconvenience." This conclusion would be relevant to the present case if Defendants or members of the community who are not subdivision lot owners, i.e., the public users of the easement, were attempting to force Plaintiff, owner of the servient estate, to maintain the roads. Instead, Plaintiff is attempting to compel Defendants to maintain the road, turning the proposition on its head. In other words, Plaintiff is arguing that, because *Dyer* stands for the proposition that the user of the easement must maintain it if the user wishes to continue to utilize the easement, the owner of the servient estate can therefore *compel* the user to maintain the easement for the benefit of the servient owner. However, *Dyer* states that if the user of the easement does not maintain it, the user will "suffer the resulting inconvenience," or the user will be unable to use the easement. As with the cases relied upon by the Court of Appeals, nothing in *Dyer* supports Plaintiff's argument that he can force Defendants to maintain the roads for Plaintiff's own benefit.

{22} Plaintiff also notes that the above quoted proposition in *Dyer* was reaffirmed by *Kennedy v. Bond,* 80 N.M. 734, 738, 460 P.2d 809, 813 (1969). In *Kennedy,* as in *Dyer,* the issue involved an easement and a right of way between private parties, and this Court explained that "[a]n easement is distinguished from a fee, and constitutes a liberty, privilege, right, or advantage which one has in the land of another." *Kennedy,* 80 N.M. at 736, 460 P.2d at 811. The Court affirmed the trial court's apportionment of "the cost of maintenance of the roadway in relation to the relative use of the parties." *Id.* at 738, 460 P.2d at 813. Again, however, nothing in *Kennedy* supports a conclusion that one who uses an easement must maintain the easement for the benefit of the owner of the servient estate.

{23} Plaintiff, arguing that summary judgment was improper, contends that "the record shows that there is no record of who owns the road, no record of anyone controlling the use of the road, and no record of anyone 'permitting' the use of the road." Plaintiff asserts that the district court erred by presuming that the roads in question are

privately owned. While Plaintiff argues that there is no record of who owns the road, Plaintiff's general position is that the general use of the roads by the public, as well as use of the roads as mail and school bus routes, makes the roads public roads, which in turn triggers Section 67–2–2's requirement that Defendants maintain these "public roads." Plaintiff thus argues that the subdivision roads have become public highways through public use. Plaintiff's claim, then, proceeds from the assumption that these roads, but for public use, would otherwise be privately owned.

{24} Plaintiff, in objecting to the trial court's finding that the roads are privately owned, noted that parties to the lawsuit included Timberlake Ranch Landowners' Association, partnership, corporate and individual developers of the subdivisions, and individual landowners and argued that, among these parties, the question of road ownership is undetermined. However, for purposes of this appeal, and for the district court's grant of summary judgment for Defendant Counties, the relevant determination is not road ownership among the landowner's association, developers, or landowners; it is road maintenance obligations between these private entities and the public. Although Plaintiff argues to this Court that Defendant "counties are attempting to shift the burden, expense, and liability of maintaining public roads onto private landowners," Plaintiff brought a declaratory judgment action in order to compel Defendants to bring the existing roads up to county standards and maintain the roads throughout Plaintiff's subdivisions. The duty to construct roads in conformity with county standards, as a part of basic infrastructure, is on the subdivider in the first instance, *see Cresswell,* 1998–NMCA–072, ¶ 2, 125 N.M. 276, 960 P.2d 818 ("Under the [Subdivision] Act, those who subdivide the land are required to provide, and pay for, the platting and basic infrastructure needed for a community to survive. Without such amenities, communities can become health hazards and a burden on taxpayers.") (citations omitted), and the counties do not incur the burden of road maintenance

under the Subdivision Act without acceptance.[3]

> [T]he imposition of subdivision controls is a classic exercise of state police power to preserve the health, safety, and general welfare of the community. Not only do subdivision regulations help insure a safe and healthy place to live, but subdivision regulations also protect tax revenues and prevent undue disbursements of public funds by limiting the creation of blighted areas. When illegal subdivisions are created without financial accountability from the subdivider, it is often the taxpayers who are left to fund essential infrastructure. . . . The legislative question is who will pay for [the essential improvements]: the sellers who initiate the chain reaction of lot splits or the innocent taxpayer? The Subdivision Act is the legislative answer to that question. Simply put, those who profit from dividing and selling unimproved land must bear some of the cost of making that land habitable.

*Id.* ¶ 22 (quoted authority, quotation marks, and citations omitted).

{25} The Court of Appeals employed the principles of prescriptive easement or implied dedication in order to apply Section 67–2–1 to the facts at issue, without acknowledging the Subdivision Act. Even if this Court concluded that prescriptive easement or implied dedication of public use regarding the roads at issue resulted in a public right of way, it does not necessarily follow that Defendants would then have the affirmative duty to maintain the roads. Plaintiff cites no authority that creates an affirmative maintenance obligation on counties arising solely from public use. Most importantly, however, we need not resort to the novel use of common law principles of prescription or implied dedication, which have previously applied only for right of way issues, when the Legislature has directed the proper method of determining county road maintenance obligations in the Subdivision Act. Thus, we conclude that the district court properly found that Plaintiff had not demonstrated that Defendants had accepted the roads for maintenance as required by the Subdivision Act.

### III. Conclusion

{26} We reverse the Court of Appeals. We conclude that the district court properly determined that Plaintiff did not satisfy the requirements of the Subdivision Act and thus did not err by granting Defendants' motion for summary judgment.

{27} **IT IS SO ORDERED**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PAMELA B. MINZNER, RICHARD C. BOSSON, and EDWARD L. CHAVEZ, Justices.

---

**3.** We also note that the Subdivision Act contains provisions that protect potential purchasers, NMSA 1978 § 47–6–23 (1996) (right of inspection and rescission), as well as remedies against subdividers, NMSA 1978, § 47–6–26 (1996) (injunctive relief available to prohibit or compel subdivider actions), NMSA 1978, § 47–6–27.1 (1996) (private remedies, in addition to other common law and statutory remedies, for aggrieved purchasers, including restitution, damages, specific performance, and costs), and criminal sanctions, NMSA 1978, § 47–6–27 (1996).