5 P.3d 1082

2000-NMCA-067

John LORENTZEN and Deana Lorentzen, Plaintiffs–Appellants/Cross–Appellees,

v.

Ronald Dean SMITH, Defendant–Appellee/Cross–Appellant.

No. 20070.

Court of Appeals of New Mexico.

June 28, 2000.

Michael L. Danoff, Michael L. Danoff and Associates, Albuquerque, for Appellants/Cross–Appellees.

W.T. Martin, Jr., Martin & Shanor, Carlsbad, for Appellee/Cross–Appellant.

## OPINION

BOSSON, Judge.

{1} This appeal affords us another opportunity to address the New Mexico Subdivision Act (the Subdivision Act), NMSA 1978, §§ 47–6–1 through –29 (1973, as amended through 1995), in light of our recent opinion in *State ex rel. Udall v. Cresswell*, 1998–NMCA–072, 125 N.M. 276, 960 P.2d 818, and particularly the concept of merger as a means to identify subterfuges that are designed to circumvent the Subdivision Act. In that context, we also discuss whether a contractual right of first refusal at fair market value constitutes an unlawful restraint on alienation of property. Holding that the right of first refusal is enforceable in this case and that the doctrine of merger under the Subdivision Act is not a bar to enforcement, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

{2} In 1978, Camille Smith deeded family land located on the Black River in southern Eddy County to Ronald Smith, Dorothy Lorentzen, and Olivia Quist, in equal undivided interests, so that "the homeplace and lands [would] remain in the family and owned by the family." Two years later, in 1980, the parties executed documents to each other so that each of the three grantees had sole ownership of a one-acre tract for the express purpose of building residences. The remainder of the Camille Smith conveyance (hereafter called "the 52–acre tract") remained with the three grantees, Smith, Lorentzen, and Quist, in undivided thirds. A final plat defining the new one-acre lots was duly prepared and recorded. Each of the three deeds for the residential one-acre lots contained an identical right of first refusal at "fair market appraised value" that could be executed by either of the other two grantees in the event its owner elected to sell. Mutual provisions for ingress and egress to each of the lots were also included in the three deeds. For his residence, Ronald Smith was deeded Lot One, which is the subject of the present dispute.

{3} Smith, Lorentzen, and Quist continued to own the 52–acre tract in undivided thirds until Smith filed a partition action in 1995. That lawsuit was eventually settled in part by Lorentzen and Quist deeding their undivided one-third interests to Smith. Smith then became the sole owner of both the 52–acre tract and Lot One. The settlement documents included a right of first refusal, similar to that contained in the deeds to the one-acre lots, that Lorentzen or Quist could exercise in the event Smith decided to sell the 52–acre tract by "match[ing] the bona fide offer of the third party." Once Smith was deeded the additional 52 acres, that land, together with his one-acre Lot One, formed one contiguous piece of land consisting of approximately 53 acres. Lot One was completely surrounded by the 52–acre tract, although Lot One continued to be separately described on the official plat map.

{4} In 1998, a third party offered Smith $165,000 for both Lot One and the surrounding 52–acre tract. Smith notified Lorentzen and Quist of the offer and their opportunity to exercise the rights of first refusal by matching the third-party offer for the entire property. Lorentzen and Quist each protested that their rights of first refusal were separate for Lot One and the 52–acre tract, so that they had a right to purchase either tract, or both, at their discretion. Lorentzen made an offer to purchase just Lot One, and Quist offered to purchase only the 52–acre tract at fair market value. Neither wanted to purchase both parcels. Smith rejected both offers and took the position that the third-party offer had to be matched in its entirety. When Smith threatened to proceed with the sale, Lorentzen filed this action seeking specific performance of his right of first refusal against Lot One only.

{5} Each side filed motions for summary judgment on the basis of undisputed facts. Smith took the position that (1) the rights of first refusal could not be enforced separately so as to split ownership of the property because to do so would violate the New Mexico Subdivision Act, and (2) the rights of first refusal were unenforceable under New Mexi-

co common law as an unreasonable restraint on alienation of property. The district court agreed with Smith's interpretation of the Subdivision Act and granted Smith summary judgment, from which Lortenzen appeals. The court also held that the right of first refusal was not an unreasonable restraint on alienation of property, from which Smith cross-appeals.

## DISCUSSION

### The Subdivision Act Does Not Prohibit These Conveyances

■ {6} The district court determined that Smith could not sell Lot One separately from the 52–acre tract "because to do so is a violation of the [Subdivision] Act." The court correctly noted that the Subdivision Act is paramount to and controlling over a contractual right of first refusal. On that basis, the court ruled that Lorentzen and Quist had to purchase the entire 53 acres at the offered price or withdraw their objections. The question before us is whether the Subdivision Act applies to Smith's intended sale. It involves an interpretation of the Subdivision Act, a question of law which we review de novo. *See Cresswell,* 1998–NMCA–072, ¶ 5, 125 N.M. 276, 960 P.2d 818.

{7} The Subdivision Act, as amended effective July 1, 1996, applies to any "subdivision," defined as "the division of a surface area of land, including land within a previously approved subdivision, into two or more parcels for the purpose of sale, lease or other conveyance or for building development, whether immediate or future." Section 47–6–2(J) (emphasis omitted). The definition of subdivision is then made subject to certain enumerated exceptions not pertinent to our discussion. *See* § 47–6–2(J)(1)–(13).

{8} As an initial inquiry, we ask how this proposed transaction could be viewed as a "division . . . into two or more parcels," when Lorentzen and Quist are purchasing separately what has been separate for more than twenty years, namely Lot One and the 52–acre tract? In response, Smith argues, as he argued below, that under the Subdivision Act, Smith's two parcels, upon being deeded to the same owner, effectively became one by a process of "accretion" or "merger." If we accept Smith's argument, then any separate sale of any part of the "merged" 53 acres, whether to Lorentzen, Quist, or anyone else, would indeed constitute a division of land "into two or more parcels," thereby implicating the remedial protections of the Subdivision Act, unless exempted elsewhere in the statute. Smith takes his merger argument from our recent discussion of the Subdivision Act in *Cresswell,* 1998–NMCA–072, ¶¶ 2–3, 26–27, 125 N.M. 276, 960 P.2d 818, and it is to that opinion that we now turn.

{9} In *Cresswell,* we borrowed the concept of merger from the Attorney General's Manual on the Subdivision Act entitled "Subdividing Land in New Mexico," which we regarded as authoritative. *See id.* ¶ 20 n. 2 (describing origin of Manual). Merger is an analytical device used by the attorney general to examine the substance, as well as the form, of efforts by illegal subdividers to circumvent the Subdivision Act and evade their responsibility to provide necessary infrastructure. *See id.* ¶ 27. For example, in *Cresswell* we discussed a hypothetical situation in which an owner of four separate, contiguous parcels could not divide each parcel into four more parcels without complying with the Act. *See id.* For purposes of the Subdivision Act, the owner's four parcels conceptually would be "merged" into one, so that the owner "could convey no more than four parcels, not four times four, without coming within the scope of the Subdivision Act." [1] *Id.* Using merger, the Subdivision

---

1. *Cresswell* interpreted the Subdivision Act as it existed before the 1996 amendments when it contained a different definition of the pivotal term "subdivision." Previously, the Subdivision Act was not implicated unless five or more parcels of land were sold within a three-year period. Thus, *Cresswell* 's hypothetical focused on whether the owner could divide each of his four parcels into four more and still steer clear of the then-existing definition of subdivision. We observed that the four original parcels would

"merge" into one, for Subdivision Act purposes, to limit the owner's exempt conveyances to a total of four, not four for each separate parcel. Today, with the 1996 amendments, an owner triggers the term "subdivision" (unless otherwise exempted in the Subdivision Act) by dividing into just two, not five parcels. Thus, under the current state of the Subdivision Act, the concept of merger may no longer be necessary to prevent multiple lot splits, or it may need to be applied in

Act's enforcer "looks to the totality of the divisions instead of each individual conveyance" to identify and control subterfuge. *Id.*

**{10}** Preventing subterfuge by unscrupulous developers is the lodestar of the Act, and merger is one of the innovative tools to work toward that goal. However, while common ownership of multiple parcels triggers merger for analytical purposes, not every instance of common ownership ultimately results in merger. Merger is not an end in itself. It is simply a means toward an end, a tool to examine the substance of the transaction for signs of subterfuge, and to determine with "common sense and reason" whether the common owner is creating a subdivision without complying with the Act. For example, the Manual acknowledges that, "[w]hether the land is 'merged' due to a common owner is also dependent upon whether the land is sold under a common promotional plan," which under the Act is itself evidence of the owner being a "subdivider." *See* § 47–6–2(I). Therefore, in considering merger, we must keep our sights set on the ultimate goal: determining whether the common owner is "engaged in an illegal subterfuge designed to circumvent the laws." To put it another way, not every sale of two contiguous lots owned by the same owner to separate buyers should automatically be considered a division of one "merged" tract, thereby implicating the Subdivision Act. Differentiating between the two depends on the myriad facts and circumstances of a given situation.

**{11}** In applying these principles to the situation before us, we fail to see how the proposed transaction between Smith and Lorentzen would result in the kind of subterfuge referred to in *Cresswell* and the Attorney General's Manual, or how it would otherwise undermine the strong public policy undergirding the Subdivision Act. Smith begins with two separate parcels that were lawfully created under the Subdivision Act as it existed in 1980. The two parcels were still lawful when the 52–acre tract was consolidated in Smith's name in 1996. If Smith sells Lot One to Lorentzen pursuant to Lorentzen's right of first refusal, there will still be only two parcels: Lot One and the remaining 52–acre tract. If Quist exercises her right of first refusal to purchase the 52–acre tract, there will still be only two parcels of land; only the ownership will have changed. But there will be no "division … into two or more parcels," Section 47–6–2(J), which is the operative core of the Subdivision Act. Of course, neither Lorentzen nor Quist could undertake any division of the two existing parcels thereafter without complying with the Subdivision Act.

**{12}** We recognize that the 52–acre tract presently surrounds Lot One, and practically speaking they are one contiguous expanse of land. But Smith did not take the legal steps necessary to consolidate the two into one; the two parcels remain separate on the official plat map. We appreciate that the legal form of the transaction—two parcels of land—is not controlling for purposes of the Subdivision Act analysis. But without any indication of subterfuge, or evidence that in substance the transaction results in a subdivision, intended or not, then the use of merger as anything more than an analytical device would exceed its purpose. *See Cresswell,* 1998–NMCA–072, ¶ 20, 125 N.M. 276, 960 P.2d 818. Certainly the district court made no findings that would imply a subterfuge or other evasive conduct by any of the parties, and we perceive no such evidence in the record. In our view, use of merger to block these conveyances from Smith to Lorentzen and Quist would elevate form over substance in a manner no less arbitrary, and no less offensive to legislative purpose, sound public policy, and common sense, than the developer's attempted use of merger in *Cresswell* to circumvent the Subdivision Act. *See* § 47–6–27.1 (providing a remedy to the purchaser, but not the seller, to avoid transactions that violate the Subdivision Act).

**{13}** In arriving at our conclusion, we further observe that Smith's Lot One is already a residential lot with infrastructure in place and improvements in use. A mere change in ownership of the same house from Smith to Lorentzen changes nothing of concern to the Subdivision Act. The same is true

a different manner. It may also be implicated in the exemptions. *See* § 47–6–2(J)(13).

for the 52–acre tract, which is not developed. Smith now owns it, and if he wants to divide it, he must follow the Subdivision Act. If Quist buys the 52–acre tract from Smith, Quist steps into Smith's shoes. If Quist wants to divide it, and there is no indication in the record that she does, then she must follow the Subdivision Act. Thus, the contemplated conveyances are consistent with a seminal motive for the Subdivision Act, to ensure "financial accountability from the subdivider ... to fund essential infrastructure." *Cresswell,* 1998–NMCA–072, ¶ 22, 125 N.M. 276, 960 P.2d 818. In this instance, that infrastructure is either already in place, or would become the responsibility of the purchaser if any division takes place.

{14} We also recognize that practical problems relating to Lorentzen's access to Lot One may still arise and may have to be resolved below. Lot One and the 52–acre tract may end up in the hands of two different owners who may be hostile to each other. The district court may have to examine the contractual provisions for ingress and egress to ensure fairness to all parties. But this is no reason not to proceed; it is merely part of the district court's agenda for consideration on remand.

### An Enforceable Right of First Refusal

■ {15} Lorentzen and Quist have separate, contractual rights of first refusal to Lot One and the 52–acre tract in the event Smith decides to sell. Smith challenges the enforceability of these provisions, claiming they constitute unreasonable restraints on alienation of property. He relies exclusively on the case of *Gartley v. Ricketts,* 107 N.M. 451, 760 P.2d 143 (1988).

{16} In *Gartley,* our Supreme Court declared unenforceable a deed restriction designed to "keep the property in the family" that not only gave a right of first refusal, but at a fixed price that was not related to current market value. *Id.* at 455, 760 P.2d at 147 (internal quotation marks omitted). Relying on an extensive discussion in the Restatement of Property, both first and second editions, the Court held the restriction unreasonable. *See Gartley,* 107 N.M. at 453–54, 760 P.2d at 145–46. Noting superficial simi-

larities between *Gartley* and the right of first refusal before us now, Smith urges reversal. We disagree because we believe the district court correctly concluded that, unlike *Gartley,* this right of first refusal does not materially restrict Smith's right of alienation.

■ {17} The Restatement (Second) of Property: Donative Transfers § 4.4, at 210 (1983) makes clear that a right of first refusal to a designated person "is not a restraint on alienation, as that term is used in this Restatement," as long as "both the price that the designated person must pay, and the time allowed for the exercise of the right of first refusal" are reasonable. The illustrations to Section 4.4, comment a, demonstrate that a right of first refusal is reasonable when it can be exercised by matching a current bona fide offer or a fair market appraisal. This makes good sense. As long as the price is not restrictive, the right of first refusal restricts the seller only minimally, if at all. The seller can alienate his property at the same price he is offered by a third party; he surrenders nothing significant by offering the property first to the designated person to see if the price can be matched. Unless the clause "reduces the likelihood that an opportunity to sell the property subject to the provision will arise should the owner desire to sell, the provision simply provides a possible buyer who is constantly available." Restatement, *supra,* § 4.4 cmt. a, at 210. The Restatement calls such a right of first refusal a "preemptive provision" which is usually enforceable, as opposed to a "forfeiture restraint," as occurred in *Gartley,* which is far more problematic. *See* Restatement, *supra,* §§ 4.2, 4.4.

{18} The right of first refusal in *Gartley* was at a fixed price, not tied to fair market value, and based on the facts and fair inferences in that opinion, it was likely below the then-current, fair market value for the property. Our Supreme Court properly applied the analysis presented in Section 4.2 of the Restatement pertaining to forfeiture restraints, and found the restriction unreasonable. *See* Restatement, *supra,* § 4.4 cmt. d, illustrations 3 and 4, at 211–13. We agree with our Supreme Court's analysis in *Gartley* because a right of first refusal at a price

*below* fair market value is much more likely to deter the free alienation of property. To be enforceable, such a provision must satisfy all the reasonableness criteria set forth in Section 4.2 and adopted in *Gartley*.

{19} The contractual rights of first refusal before us in this appeal are not forfeiture restraints; they are merely preemptive provisions as described in Section 4.4 of the Restatement. Thus, they are enforceable as long as the price and timing are reasonable. The reasonableness of the price is self-evident: either matching a bona fide offer for the 52–acre tract, or offering fair market appraised value for Lot One. Smith does not make an issue that the price is unfair, nor could he based on this record. Nor does Smith contend that the time allowed Lorentzen and Quist to exercise their rights of first refusal are unreasonable. Accordingly, and in a manner consistent with *Gartley,* with the Restatement, and with the common law, we affirm the district court and hold that these rights of first refusal are reasonable and do not constitute an unlawful restraint on alienation of property.

## CONCLUSION

{20} We affirm the district court's conclusion that the rights of first refusal do not constitute an unlawful restraint on alienation of property. We reverse the district court's conclusion that enforcement of these rights of first refusal would violate the New Mexico Subdivision Act. We remand for enforcement of the rights of first refusal and for further proceedings consistent with this opinion.

{21} **IT IS SO ORDERED.**

APODACA and BUSTAMANTE, JJ., concur.