168 P.3d 1087 (2007)
2007-NMCA-129
PRIMETIME HOSPITALITY, INC., Plaintiff-Appellee,
v.
The CITY OF ALBUQUERQUE, Defendant-Appellant.
No. 25,616.
Court of Appeals of New Mexico.
June 13, 2007.
Certiorari Granted September 25, 2007.
*1089 McCary, Wilson & Pryor, Dennis M. McCary, Sutin, Thayer & Browne, Kerry Kiernan, Albuquerque, NM, for Appellee.
City of Albuquerque, Robert M. White, City Attorney, Mark Hirsch, Deputy City Attorney, Robert Waldman, Assistant City Attorney, Peter Auh, Assistant City Attorney, Albuquerque, NM, for Appellant.
Certiorari Granted, No. 30,543, September 25, 2007.

OPINION
BUSTAMANTE, Judge.
{1} This inverse condemnation case presents an issue of first impression in New Mexico: What is the proper measure of damages for a temporary, but total, physical taking of a commercial property in the early stages of construction? Following a bench trial the district court awarded Plaintiff Primetime Hospitality, Inc. (Primetime), $456,242 for lost profits and $153,518.45 for excess construction costs, plus interest and costs against the City of Albuquerque (City). The City appeals contending that the district court erred in awarding consequential damages to Primetime. The City also argues that the court improperly awarded Primetime costs. In its cross-appeal, Primetime argues that the district court erred in denying its request for attorney fees. We reverse in part and affirm in part as to the appeal and remand for further proceedings on the City's appeal. We affirm the denial of attorney fees in the cross-appeal.
FACTS
{2} Primetime is experienced in the business of developing, owning, and operating hotels. In early 2000 Primetime started planning for a hotel near the airport in southeast Albuquerque. Prior to starting construction, Primetime entered into a franchise arrangement with Hilton Inns, Inc. that imposed a substantial liquidated damages provision if the facility was not completed. Primetime also arranged construction financing and hired a contractor.
{3} Within two months of the start of construction, Primetime's contractor struck and ruptured an encroaching City main waterline. At about the same time, Primetime discovered another encroaching domestic waterline. The waterlines had to be physically relocated by the City. The district court found that the relocation process delayed construction for a 102-day period. The district court also found that as a direct result of the construction interruption, another 40-day delay occurred due to winter weather.
{4} Primetime filed its complaint for damages before construction was complete asserting causes of action for inverse condemnation and trespass. The trespass claim was dismissed with Primetime's approval. Primetime moved for summary judgment on the issue of liability, and the parties eventually entered into a "Stipulated Partial Summary Judgment Order on Liability" in which the City stipulated to liability for inverse condemnation. The stipulated order specifically reserved all issues relating to the proper measure of damages and attorney fees.
*1090 {5} The parties then filed cross motions for summary judgment as to the elements of damages Primetime could pursue at trial. Primetime argued, as it does here, that it was entitled to a full measure of separate consequential damages covering (1) physical damage to the property from water discharge; (2) clean-up, re-excavation, and all additional construction costs caused by the delay; (3) the reasonable fair market value of the loss of use of the property; and (4) the net lost profits the hotel would have generated had there been no delay. The City argued that Primetime was limited to a traditional "before and after" measure of damages with no separate provision for any consequential damages. The district court granted Primetime's motion for summary judgment specifically with respect to lost profits, ruling that they were a "proper element of damages."
{6} The parties' approach did not change through trial as evidenced by their written closing arguments and proposed findings of fact and conclusions of law. The district court awarded damages for lost profits and additional construction costs in the exact amount Primetime requested. The lost profit calculation was based on a 142-day delay in opening the hotel. The additional construction cost figure included a number of items, some connected directly to repairing water damage, but the vast majority connected to the delay of construction. The excess construction costs include:

 Excess Construction Costs:
 Admin. Time 5,000
 Buttress Wall 76,856.94
 Hussein Salary (PD 266.66) 37,864.14
 Mayan Construction 23,196.77
 LSC Landscaping 1,465.50
 Cartesian 507.04
 Custom Grading 5,400.00
 Vineyard 502.61
 Builders Risk (7.67/day) 1,089.14
 Pat Richardson (88.90 PD) 1,236.64
 Fence 400.00
 Total 153,518.45

{7} The City does not question the district court's finding that the additional construction costs were incurred as a direct result of the encroaching waterlines. Nor does the City dispute the accuracy or reasonableness of the additional costs or lost profit figures. Rather, the City limits its challenge to the legal question of whether any of them are permissible in inverse condemnation actions.
{8} In support of the lost profits award, the district court found as a fact that Primetime's expert "demonstrated that a before and after appraisal methodology would not be appropriate to measure the lost profits suffered by [Primetime]." The district court concluded as a matter of law that "[w]hen reliable proof of damage and its amount is presented by a methodology other than a before and after appraisal, such proof is admissible on the damage issue."
JUST COMPENSATION FOR A TEMPORARY TAKING
{9} The City's power of eminent domain is limited by the constitutional requirement that the property owners be paid "just compensation." See N.M. Const. art. II, § 20 (stating that "[p]rivate property shall not be taken or damaged for public use without just compensation"); City of Sunland Park v. Santa Teresa Servs. Co., 2003-NMCA-106, ¶ 43, 134 N.M. 243, 75 P.3d 843 (recognizing that "[t]he primary condition to the exercise of eminent domain is the constitutional requirement to pay just compensation"). The statutory provision carrying out this constitutional mandate in the context of inverse condemnation, NMSA 1978, § 42A-1-29(A) (1983), states:
A. A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation . . . is liable to the condemnee, or any subsequent grantee thereof, for the value thereof or the damage thereto at the time the property is or was taken or damaged. . . .
The City argues that the district court applied a constitutionally and statutorily improper measure of damages. This is a question of law that we review de novo. See Lorentzen v. Smith, 2000-NMCA-067, ¶ 6, 129 N.M. 278, 5 P.3d 1082.
{10} New Mexico's constitution mandates just compensation when property is taken or damaged but does not say how to measure it *1091 in any particular circumstance. Similarly, our Eminent Domain Code contemplates just compensation but provides little guidance as to its measurement. For example, NMSA 1978, § 42A-1-24(A) (2001) simply provides that "actual value" as of the date a petition of condemnation is filed shall constitute just compensation. The Code is more specific in describing the measure of damages to remainders in partial taking cases. NMSA 1978, § 42A-1-26 (1981) (describing the measure of damages to remainder properties as the "difference between the fair market value of the entire property immediately before the taking and the fair market value of the property remaining immediately after the taking"). But the Code does not address in any way how to measure damages for a temporary taking-physical or regulatory.
{11} Before entering into our discussion of the law of damages for temporary taking, both within this state and without, we believe it prudent to emphasize the unique circumstances with which we are confronted. The case could be viewed as a temporary invasion incidental to negligence by the City in the placement and mapping of its water lines. We need not decide or even examine in detail whether the case could have been brought as a tort action. The parties stipulated to the dismissal of the trespass claim, Primetime never sought compensation under the Tort Claims Act, and the City stipulated to liability for inverse condemnation. Thus, we decide the case on the basis that it was presented both below and to us-as a proper case for inverse condemnation in which we need only decide the proper measure of damages.
{12} This Court has addressed damages for a temporary regulatory taking in one case. In PDR Development Corp. v. City of Santa Fe, 120 N.M. 224, 900 P.2d 973 (Ct. App.1995), the trial court determined that a zoning ordinance had been unlawfully applied to PDR's existing property, but then refused to grant damages in the form of lost profits. Id. at 226-27, 900 P.2d at 975-76. We affirmed the trial court's refusal to grant lost profits damages and enunciated a measure of damages tied to the "market rate of return on the difference in the fair market value of the property without the restriction and the fair market value of the property with the restriction for that period of time during which the restriction was in place." Id. at 226, 900 P.2d at 975. The City relied heavily on this aspect of PDR in its briefing before us.
{13} Taken at face value, application of this measure would seem to provide a ready answer to this case. As the City recognized at oral argument, however, PDR is not a cure-all given the factual circumstances we deal with here. First, it is unclear how the PDR formula would apply to the disruption of a construction process such as we have here. Second, the PDR formula was taken from an Eleventh Circuit opinion, Wheeler v. City of Pleasant Grove, 833 F.2d 267 (11th Cir.1987). As we will develop later in this opinion, the Wheeler formula was clearly influenced by the facts in that case and represents but one of a number of approaches taken by the federal courts to measure damages in temporary takings cases. See id. at 271. Thus, we feel less bound to try and apply Wheeler here than if it represented a unified and consistent federal approach to the issue. Third, at least two of the cases cited in PDR in support of the Wheeler formula appear to apply a different measure, thus emphasizing the lack of uniformity in the case law on the issue. See Whitehead Oil Co. v. City of Lincoln, 245 Neb. 680, 515 N.W.2d 401, 411-12 (1994) (awarding the actual difference between rent available for office usage as opposed to retail usage); Sheerr v. Twp. of Evesham, 184 N.J.Super. 11, 445 A.2d 46, 74 (Ct.Law Div.1982) (granting damages equal to the "option value" of the premises for the period of the taking "calculated on the market value of the property without any zoning regulation" plus fees, costs, and interest). Finally, PDR itself appears to leave room for proof and payment of "temporary market damages" such as loss of rental income. PDR Dev. Corp., 120 N.M. at 227, 900 P.2d at 974.
{14} Believing that PDR does not provide a definitive answer, we return to first principles, although we remain guided by the approach we approved in PDR. As a general matter the stated aim of just compensation is to pay a property owner "an amount sufficient *1092 to cover his loss-that is, to make him whole and fully indemnify him." State ex rel. State Highway Comm'n v. Pelletier, 76 N.M. 555, 560, 417 P.2d 46, 49 (1966). We are aware that the notion of full indemnification in the context of condemnation proceedings is generally recognized to encompass a more limited range of remedies than, for example, negligence tort law. The roots of that difference are not easily disentangled. See Robert Brauneis, The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law, 52 Vand. L.Rev. 57 (1999) (tracing the development of just compensation litigation in state courts from the pre-civil era reliance on common law torts to the development of a theoretical basis grounded more on constitutional mandates with remedies and procedures influenced by a variety of factors including sovereign immunity concepts, socioeconomic forces, and legislative enactments). We cannot unravel those roots here; we do remain mindful of their effects on our case law.
{15} The problem of calculating value and deriving appropriate eminent domain damages caused by temporary takings has been particularly vexing. The leading treatise on eminent domain asserts that the measurement of compensation for a "temporary taking is not the same as determining value when the acquisition is permanent." 4 Julius L. Sackman, Nichols on Eminent Domain § 12E.01[1] (3d ed.2006) [hereinafter Nichols]. Noting that loss in market value is not a proper criterion, Nichols lists three alternative methods used to calculate compensation: (1) the value of the property for the time it is held by the condemnor; (2) the difference in the value of the property before and after the taking; (3) the fair market rental value of the property during the time it was taken. Nichols, supra, § 12E.01[1], at 12E-2.1 to -3; see 2 Dan B. Dobbs, Dobbs Law of Remedies § 6.9(2), at 182 (2d ed.1993) (noting that the types of "harm suffered by the landowner may be quite varied and no single damages measure is likely to properly cover all cases").
{16} The Nichols list is actually underinclusive. We have already noted the option value measure allowed in Sheerr. Other cases have allowed damages for fixtures and permanent equipment destroyed or subject to excessive wear and tear during the taking. See, e.g., United States v. General Motors Corp., 323 U.S. 373, 383-84, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (discussing a possible different approach to measuring damages when the government takes occupancy of a premises for a temporary period rather than taking property permanently). In the General Motors case, the Supreme Court also allowed consideration of the cost of moving and storing personal property from the occupied building as a component affecting the rental value of the building for the duration of the taking. Id. at 383, 65 S.Ct. 357. The Court acknowledged this would not be proper in a permanent taking context. Id. at 379-80, 65 S.Ct. 357. In another of its post-World War II takings cases, the Supreme Court approved a damage award for lost business goodwill. In Kimball Laundry Co. v. United States, 338 U.S. 1, 3, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), the Court was faced with a situation in which government (the Army) had occupied a business property (a laundry) with the intent of carrying on the laundry to serve Army personnel and actually utilized not only the property but the employees as well. As a result, the Court recognized, the business owner could not simply move its business elsewhere. The effect was that the business lost the value of what it called "trade routes." Id. at 8, 69 S.Ct. 1434. The Court treated the taking as if the government had acquired the going concern value of the business and held that compensation for that loss was required. Id. at 16, 69 S.Ct. 1434.
{17} The Supreme Court's rationale for treating temporary takings differently is multifaceted. In General Motors the Court was concerned that the total award under the standard used by the district court-the market long term rental rate for bare space-did not even cover the owner's continuing rental obligation, much less the demonstrable and comparatively larger costs of moving and damage to equipment and fixtures. General Motors, 323 U.S. at 376, 382-84, 65 S.Ct. 357. Aware that the owner had not received anything near what it had lost, the Court was clearly concerned about the "just" component *1093 of just compensation. See id. at 382, 65 S.Ct. 357. Also in General Motors, the Court held that in temporary takings cases the owner's property interest in fixtures and permanent equipment was entitled to be recognized as a separate matter from its possession and use interests in the structure. Id. at 383-84, 65 S.Ct. 357.
{18} The Supreme Court's concern in Kimball Laundry Co. was more abstract, but quite relevant to our case. Noting that compensable value of property in the eminent domain context generally concerns itself with transferable values, the Court made clear that when
property is of a kind seldom exchanged, it has no "market price," and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. These considerations have special relevance where "property" is "taken" not in fee but for an indeterminate period.
Kimball Laundry Co., 338 U.S. at 5-6, 69 S.Ct. 1434 (citation omitted). The Court concluded that a temporary interruption "so greatly narrows the range of alternatives open to the condemnee that it substantially increases the condemnor's obligation to him." Id. at 15, 69 S.Ct. 1434. In short, the Court made clear that context matters in calculating just compensation. It is important to keep in mind that the Court made its statement in the course of deciding that the value of the trade routes was property the loss of which should be compensated.
{19} The lower federal courts have heeded the Court's lesson. The federal courts appear to adjust their approach to damages to fit the situation before them. For example, in Independence Park Apartments v. United States, 465 F.3d 1308, 1311 (Fed.Cir.2006), denying a petition for rehearing, the Federal Circuit Court relied on Supreme Court cases to reiterate that "measuring just compensation can be difficult in certain instances and is not amenable to a rigid formula." In a prior opinion, the Court had approved a method of calculation that included actual lost rents caused by an improper federal regulation. See Independence Park Apartments v. United States, 449 F.3d 1235, 1246-48 (Fed.Cir.2006); Independence Park Apartments v. United States, 61 Fed.Cl. 692, 706-08 (2004) (rejecting government assertion that damages be limited to interest on lost rents and instead awarding net lost rents). In addition, federal courts routinely grant restoration and repair damages in addition to rental values for the term of the taking. Riverside Military Acad., Inc. v. United States, 122 Ct.Cl. 756, 783 (1952); United States v. 37.15 Acres of Land, 77 F.Supp. 798, 802-03 (S.D.Cal.1948). And the calculation of rental value is customized to the particular facts of each case. See Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1580 (Fed.Cir.1990) (equating rental value with the "minimum amount in rent and royalties that [the plaintiff] would have received" under a proposed joint venture agreement which was not entered into because of the government's temporary taking of the property). Some courts get quite creative with their efforts to reflect reality. See Herrington v. County of Sonoma, 790 F.Supp. 909, 915-16 (N.D.Cal.1991) (calculating "lost use-value of the property" by applying a probability analysis).
{20} State courts have displayed even greater flexibility in fashioning appropriate remedies for temporary takings. In Poirier v. Grand Blanc Township, 192 Mich.App. 539, 481 N.W.2d 762, 766-67 (1992), a regulatory temporary taking case, the court rejected a "fair market value rate of return" measure as inadequate to "place plaintiff in as good a position as he would have been had no taking occurred." Instead, relying on an approach suggested by the Arizona Supreme Court, the court in Poirier upheld an award for increased construction costs and loss of income. Id. (citing Corrigan v. City of Scottsdale, 149 Ariz. 538, 720 P.2d 513, 518-19 (1986) (en banc) (advocating for a flexible approach to damages in temporary takings cases aimed at compensating owners for actual losses suffered and requiring that such damages "be provable to a reasonable certainty similar to common law tort damages")); see also W.H. Pugh Coal Co. v. State, 157 Wis.2d 620, 460 N.W.2d 787, 791 (Ct.App.1990) (approving lost income as a *1094 consideration in assessing the "reasonable value of the property's use" as a proper measure of damages for a temporary taking of property which limited the owner's ability to expand his business (internal quotation marks and citation omitted)); City of San Antonio v. Guidry, 801 S.W.2d 142, 150-51 (Tex.Ct.App.1990) (allowing lost profits as damages caused by temporary interference with access to restaurant eventually causing the business to fail).
{21} Finally, academic commentators agree that no one measure of damages is appropriate to meet all of the factual scenarios bound to be seen in temporary takings. They urge courts to be sensitive to this reality and remain flexible in their approach. David Schultz, The Price is Right! Property Valuation for Temporary Takings, 22 Hamline L.Rev. 281, 294 (1998); Joseph P. Mikitish, Note, Measuring Damages for Temporary Regulatory Takings: Against Undue Formalism, 32 Ariz. L.Rev. 985, 1002 (1990); Cynthia J. Barnes, Comment, Just Compensation or Just Damages: The Measure of Damages for Temporary Regulatory Takings in Wheeler v. City of Pleasant Grove, 74 Iowa L.Rev. 1243, 1252 (1989).
{22} Considering all of the above, we turn back to the job of resolving this case while keeping in mind that the City does not challenge the amounts reflected in the judgment on a factual basis. We must decide whether, and if so, how, New Mexico should adapt its takings law to adequately recognize Primetime's loss and fashion a reasonable remedy. We agree with the cautionary approach suggested by the Arizona Supreme Court in Corrigan, however, and we will not attempt to create a measure to be used in all temporary takings cases.
EXCESS CONSTRUCTION COSTS
{23} The judgment reflects two separate categories of damages-excess construction costs and lost profits. Adopting the Supreme Court's approach in General Motors and Kimball Laundry Co., we hold that except for the award for the cost of the buttress wall ($76,856.94), the excess construction costs award should be affirmed. All of the costs-except the buttress wall-are directly related to the interruption of the construction project and would not have been incurred but for the City's interference with the owner's loss of possession and use of the property. In a real sense these costs were imposed on Primetime by the City. As such, they are akin to the repair and restoration expenses allowed in General Motors and Kimball Laundry Co. They are also akin to the types of special damages allowed in partial takings cases. UJI 13-705 NMRA allows the award of special damages for such items as replacing fencing, parking areas, and signage, as well as loss of crops and fertilizing, reestablishment of irrigation works and relocation expenses. El Paso Elec. Co. v. Pinkerton, 96 N.M. 473, 474, 632 P.2d 350, 351 (1981); Transwestern Pipe Line Co. v. Yandell, 69 N.M. 448, 458, 367 P.2d 938, 944 (1961). Awarding these damages also serves the aim of putting the landowner in the same pecuniary position as though the taking had not occurred. See Pelletier, 76 N.M. at 560, 417 P.2d at 49; Fowler Irrevocable Trust v. City of Boulder, 17 P.3d 797, 799, 806 (Colo.2001) (en banc) (allowing restoration costs and fair rental value for temporary possession of vacant land).
{24} The cost of the buttress wall is a potentially different matter. The testimony of Primetime's architect and construction manager makes it clear that a wall was redesigned as a bearing wall in order to reduce construction time after Primetime regained possession of the site. The redesign was not strictly required by the City's taking. In this sense the City is correct when it asserts that the buttress wall represents a mitigation of damages effort by Primetime. The question is whether that by itself makes the expense noncompensable here.
{25} In run-of-the-mill tort and contract cases a plaintiff is normally entitled to recover the reasonable cost of mitigating its damages, usually regardless of whether the mitigation efforts are successful. Spang Indus., Inc. v. Aetna Cas. & Sur. Co., 512 F.2d 365, 370-71 (2d Cir.1975); see 1 Dan B. Dobbs, Dobbs Law of Remedies § 3.9, at 383 (2d ed.1983). But, of course, this is not a *1095 contract or tort action. Is the fact that this is an inverse condemnation case sufficient by itself to preclude consideration of mitigation expenses? Or, put another way, does the basic nature or purpose of the condemnation action preclude consideration of mitigation efforts as a factor in fixing damages? Given the uniqueness of temporary takings, and this circumstance in particular, we hold that it does not. At least one way in which temporary takings differ from permanent appropriations is that the owner likely has an interest in returning to the property. On return the owner may continue a prior use, finish development of an interrupted use, or find a new use for the property. The owner's interest in, or need to spend money on, the property upon return will vary depending on any number of variables. We see no reason why reasonable expenditures demonstrably aimed at reducing the losses suffered by an owner subjected to a temporary taking should not be reflected in the award. The policy rationale underlying the encouragement to mitigate damages is at play in this arena just as it is in contracts and tort law. Appropriately used mitigation would help reduce the losses suffered by property owners and the damages payable by inverse condemnation defendants. For example, if a taking were caused by flooding and the owner could prevent the flooding from inundating the entire property by building a barrier of some kind and thus averting greater harm to the remainder of the property, we see no reason not to allow as damages the reasonable cost of the barrier. However, if the barrier has independent worth to the owner, which the owner gets to keep after the temporary taking, then its value should not properly be a part of the damages.
{26} Of course the key requirement is reasonableness under the circumstances. One way to evaluate reasonableness is to compare the cost of the mitigation effort to the value of the harm averted. The district court did not address this issue explicitly. On remand it will be Primetime's burden to demonstrate reasonableness of its mitigation effort in light of the general damages award, excluding excess construction damages.
{27} We emphasize that any award for excess construction costs will likely be, but may not be, entirely separate and distinct from the value of the right of occupancy and use we discuss later in this opinion. General Motors, 323 U.S. at 384, 65 S.Ct. 357. On remand the district court should ensure that there is no double recovery.
LOST PROFITS
{28} We now turn to the award of lost profits. The parties' approaches to this issue are starkly different. Though it does not say so explicitly, Primetime would have us adopt a full tort measure of damages. The City's approach has evolved. In the district court, the City argued for a "before and after" measure, but it also presented evidence of lost rental value. At oral argument the City altered its position and conceded that under the United States Supreme Court opinions in General Motors and Kimball Laundry Co., a fair rental value approach for the period of the taking was more appropriate. We conclude that neither approach is entirely correct, though the City is closer to the mark.
{29} Primetime urges us to adopt the approach taken by the Michigan Court in Poirier and allow a "full" measure of damages. More precisely, Primetime argues that New Mexico already allows full consequential damages in inverse condemnation. Primetime relies on Estate & Heirs of Sanchez v. County of Bernalillo, 120 N.M. 395, 902 P.2d 550 (1995) and State ex rel. State Highway Comm'n v. Chavez, 80 N.M. 394, 456 P.2d 868 (1969) for the proposition that New Mexico already recognizes and grants a full measure of consequential damages in condemnation actions. Primetime's reading of these cases is simply too broad.
{30} Primetime plucks the following partial quote from Chavez to support its argument: "all the elements of damage resulting from [inverse condemnation]." Id. at 399, 456 P.2d at 873. The full sentence is: "We see nothing in our earlier holding that denied the right to have all the elements of damage resulting from the condemnation considered when arriving at the award." Id. In Chavez, the defendant conducted a retail business on leased acreage. Id. at 397, 456 P.2d at 871. *1096 The partial quote Primetime relies on is included in a discussion in which the Court rejects an argument made by the condemning agency that in a prior opinion in the case the Court had limited the owner's damages to the remainder of the term of the lease in effect when the taking occurred. Id. at 399, 456 P.2d at 873. The full sentence from which the quote is extracted simply reflects the Court's holding that lease renewals could be taken into account in determining the before and after value the owner could assert.
{31} Sanchez was a zoning case in which the Supreme Court held that inverse condemnation did not lie because the zoning action-whether proper or not-did not deprive the owner of all or substantially all beneficial use of its property or cause an injury other than that suffered by the general public. 120 N.M. 395-96, 398-99, 902 P.2d at 550-51, 553-54. To the extent Sanchez discusses consequential damages it does so in response to the property owner's argument that it could claim damages under cases such as Board of County Commissioners v. Harris, 69 N.M. 315, 366 P.2d 710 (1961). Sanchez, 120 N.M. at 398-99, 902 P.2d at 553-54. Harris, in turn, is one of the first cases in which New Mexico recognized a cause of action under our constitution for damages when property is damaged by government action even though the property itself is not taken. 69 N.M. at 317, 366 P.2d at 712. In Harris, highway improvements had affected the owner's access to his property causing a demonstrable reduction in value. Id. at 316-17, 366 P.2d at 711-12. The measure of damage in Harris was the traditional before and after measure. Id. at 318, 366 P.2d at 713.
{32} Sanchez and Harris do not use the term "consequential damages" in a technical sense to describe the kind of damages that can be awarded in condemnation cases. They use the term generically to say that an action for damages (properly measured) may be available if government action harms some aspect of an owners's property interest even though the property has not been physically taken. The Dobbs treatise makes this plain:
The term consequential damages in the law of eminent domain is sometimes used in a very special sense. When only a portion of a tract of land is taken, it is common to speak of damages to the remaining and untaken portion of the tract as consequential damages. But this often refers to the diminished value of the remaining land rather than damages that would be called consequential in other settings.
Dobbs, supra, § 6.9(2) n. 14. Thus, we disagree with Primetime's assertion that New Mexico already recognizes a tort measure for damages in condemnation.
{33} Since New Mexico has not adopted a tort measure of damages in condemnation, we must decide whether to follow cases like Poirier at least in the specific circumstance of temporary takings. We decline to do so. First, we already have a case, PDR Development Corp., which indicates that we take a narrower view of condemnation damages than many of the states and we follow more closely the federal law in this regard. Second, we detect no general movement in our condemnation case law toward a broader measure of damages. Perhaps New Mexico courts have not been specifically asked to consider such a move. But we frankly doubt our courts would adopt the rationale of cases such as State v. Hammer, 550 P.2d 820, 824, 827 (Alaska 1976), a permanent takings case in which the Alaska Supreme Court rejected the normal rule that damages over and above the fair market value of the actual physical property taken are simply not recoverable. This is not evidence of judicial timidity. See County of Doña Ana v. Bennett, 116 N.M. 778, 784, 867 P.2d 1160, 1166 (1994) (quoting Nichols approvingly for the proposition that "`judicial power has been held to be a constitutionally guaranteed limitation upon the power of the legislature to fix the rule of damages to the detriment of the rights of the owner to just compensation'" (citation omitted)). We simply see no felt need in our courts to adjust the usual rules in the permanent takings context. See Leigh v. Village of Los Lunas, 2005-NMCA-025, ¶ 13, 137 N.M. 119, 108 P.3d 525 (applying the "before and *1097 after" rule in the context of the permanent taking of a restrictive covenant).
{34} Second, Poirier is distinguishable in that it involved a regulatory taking caused by an unconstitutional zoning of the owner's property. 481 N.W.2d at 765. Though litigated as a constitutional taking of private property without compensation, Poirier could have been prosecuted as a damages claim under 42 U.S.C. § 1983 (2000). The cause of action and the remedy allowed in Poirier can thus be analogized to a tort action. See Zaintz v. City of Albuquerque, 739 F.Supp. 1462, 1467, 1469-70 (D.N.M.1990) (denying summary judgment by defendant and allowing § 1983 action based on allegedly arbitrary zoning action to proceed to trial); County Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 168-70 (3d Cir.2006) (drawing distinctions between just compensation takings claims and Section 1983 substantive due process and equal protection claims arising from zoning actions).
{35} Primetime did not assert a Section 1983 claim and we do not see any basis for one under these facts. Because of the stipulation that this was a physical taking, in accord with the Supreme Court's specific holding in Kaiser Steel Corp. v. W.S. Ranch Co., 81 N.M. 414, 421-22, 467 P.2d 986, 993-94 (1970), Primetime was limited to its inverse condemnation remedy. The default measure of damages for Primetime's loss is thus an eminent domain measure. Whatever that measure ultimately may be, we do not agree that we must import tort concepts wholesale to provide constitutionally adequate just compensation.
{36} What then is an appropriate way to measure Primetime's damages? We have already rejected Primetime's invitation to apply a pure tort measure. The City's alternative approach is also unsatisfactory. At oral argument the City proposed an approach suggested by the Supreme Court's opinions in General Motors and Kimball Laundry Co. The City argued that a combination of rental value for the time of the taking and some recognition of excess construction costs would yield a reasonable figure. While we could agree with the City's general approach, the specific figures used by the City cause concern. The difficulty is two-fold. First, the excess construction costs it would agree to were based on its expert's first "before and after" market value analysis. This approach assumed a potential sale and was based on what the market would recognize in such a hypothetical sale. That assumption in this circumstance could easily be viewed as ignoring reality. And as we have affirmed for the most part the excess construction costs based on Primetime's approach, we need not discuss the City's approach to them any further.
{37} Second, the rental value suggested by the City could similarly be viewed as being disconnected from the facts in this case. The City's suggested basis for a rental value is the property's value as a car rental lot. The difficulty with that comparison is obvious. The property was no longer a rental car lot when the City's occupation occurred. After Primetime's purchase, it became an active construction site backed by an executed franchise agreement and financing adequate to build an operating hotel. The Supreme Court noted in General Motors that it would be inappropriate to value the temporary taking of an active leasehold on the basis of a long term rental of vacant premises. General Motors, 323 U.S. at 382, 65 S.Ct. 357. Rather, the value should be "the market rental value of such a building on a lease by the long-term tenant to the temporary occupier." Id.
{38} We believe this same approach should guide valuation here. The question then becomes how to calculate the figure in what would be an "extraordinary and unusual transaction." Id. at 383, 65 S.Ct. 357. We have already determined that the excess construction costs should be treated separately like the damaged or destroyed fixtures and equipment in General Motors. Id. at 383-84, 65 S.Ct. 357. What is left to measure once basic out-of-pocket items are accounted for? Since the goal of just compensation is to measure and pay for what the owner has lost, we must analyze this question from Primetime's viewpoint. That viewpoint should not include merely personal, unique, or idiosyncratic factors. See Kimball Laundry Co., 338 U.S. at 5, 69 S.Ct. 1434. Rather it should *1098 focus on what the Supreme Court has referred to as "transferable value." Id. If there is a recognized market for such exchanges, the market's method of valuation is a reasonable proxy for-indeed, the best indicator of-value. Id. at 6, 69 S.Ct. 1434. The Supreme Court also explained how to deal with situations where there are no established markets.
But when the property is of a kind seldom exchanged, it has no "market price," and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. These considerations have special relevance where "property" is "taken" not in fee but for an indeterminate period.
Id. (citation omitted).
{39} The taking here interfered with Primetime's possession and use of the property. Possession and use from Primetime's standpoint translated into delay in construction and ultimately delay in opening the hotel. Primetime quantified the value of this delay by equating it to lost gross profits-or cash flow. We note that though not the focus of the City's argument, we harbor concern about the propriety of Primetime's proof of damages even under a tort theory. Primetime's experts calculated the $456,242 lost profit based on gross income less current gross operating expenses without taking into account depreciation or mortgage expenses. As a result the figure derived is more akin to lost cash flow than lost profits. We obviously do not need to decide here whether that approach is appropriate. Another flaw in this approach is that directly allowing lost profits treats Primetime's loss as a true business interruption claim. Primetime's measure of loss might be more germane if it had been forced to close a functioning hotel; but that is not what happened. Its loss was delay at an early stage of construction.
{40} This does not mean that lost profits are irrelevant to the calculation of Primetime's damages. They may be taken into account, but only as a component in calculating rental value for the period of delay. As noted in Dobbs,
[i]f, as a result of the defendant's invasion, the plaintiff is unable to use the land and to develop it, he might traditionally recover, as general damages, the rental value of the land for the period in which he was dispossessed or for the period in which the land was unusable. Alternatively, he might be granted special damages for any actual profits he could have made by use of the land during the period in question. But he should not recover both. Rental value of the land would be an objective or market estimate of the land's value for the purpose of generating profits; so an award of rental value already takes into account the profitability of the land, and the plaintiff must not be allowed to recover both.
1 Dobbs, supra, § 5.12(2), at 832-33 (footnotes omitted); see Keystone Assocs. v. State, 55 A.D.2d 85, 389 N.Y.S.2d 895, 899 (App.Div.1976) (Greenblott, J., concurring in part and dissenting in part) ("While potential profits themselves would be an inappropriate measure of damages, projected return [on the property] could be taken into account by experts, together with the other figures cited, in determining a fair rental value."), approved, 45 N.Y.2d 894, 411 N.Y.S.2d 8, 383 N.E.2d 560 (1978).
{41} In this context the ultimate question is: What would an objective property owner accept to delay construction of a hotel facility in this circumstance for a period of 142 days? We leave the details of the calculation to the parties' accounting and economics experts on remand.
COSTS
{42} The City argues that the district court erred in awarding costs to Primetime for expert witness fees relating to the measure of damages based on lost profits. The City's theory is that the expert's fees were not reasonable and necessary because they testified to a measure of damages that is not recoverable in an inverse condemnation action as a matter of law. The City does not quarrel with the amount of the fees as such. Primetime's response is that: (1) it is the prevailing party; (2) nothing requires a party to prevail on the specific issue on which a particular expert testifies in order to recoup his costs; and (3) it was necessary for the *1099 district court to hear testimony about lost profits to consider "complex issues as to the proper methodology to use to assess lost profits under the factual circumstances of this case."
{43} We review award of costs under an abuse of discretion standard. Pioneer Savings & Trust, F.A. v. Rue, 109 N.M. 228, 231, 784 P.2d 415, 418 (1989). The district court has wide discretion to award costs to the prevailing party, including costs for multiple experts, if it determines their testimony was reasonably necessary for the case. Dunleavy v. Miller, 116 N.M. 353, 362-63, 862 P.2d 1212, 1221-22 (1993).
{44} Rule 1-054(D)(1) NMRA provides that costs "shall be allowed to the prevailing party unless the court otherwise directs." Rule 1-054(D)(2)(g) lists expert witness fees as a recoverable cost "as limited by [NMSA 1978, §] 38-6-4(B) [(1983)]." The statute provides that the district court may award a reasonable fee "for any witness who qualifies as an expert and who testifies." The statute allows the district court to award costs for more than one expert on liability or damages if such testimony is "reasonably necessary" and "not cumulative." Id.
{45} Although we see no abuse of discretion in the district court's award given that Primetime was the prevailing party below, in light of our remand, we believe it only appropriate to vacate the award of costs and allow the judge to redetermine the costs to be awarded once it makes a proper award of eminent domain damages. If the court finds that the expert's testimony is reasonable and necessary because lost profits are part of the mix of information the district court needed-and will need on remand-to evaluate the difficult issue of valuation in this case, then it may consider awarding the costs of that expert even though we have reversed the award of lost profits as a separate item of damages.
ATTORNEY FEES
{46} Primetime appeals the district court's refusal to grant its attorney fees arguing that (1) the facts in its case are "indistinguishable" from the relevant facts in Landavazo v. Sanchez, 111 N.M. 137, 141-43, 802 P.2d 1283, 1287-89 (1990) (Montgomery, J., specially concurring, but delivering the opinion for the majority on this issue); (2) the district court erred in allowing the City to introduce evidence that its placement of the waterlines was merely inadvertent or a mistake; and (3) we should extend the holding of Landavazo and allow attorney fees as a matter of course in inverse condemnation cases.
{47} The parties disagree about the standard of review we should apply. Primetime argues for a de novo standard on the theory that it presents a pure question of law concerning the proper interpretation and application of NMSA 1978, § 42A-1-25(A)(3) (1981), and article II, § 20 of the New Mexico Constitution. The City argues the problem is only subject to an abuse of discretion standard, citing New Mexico Right to Choose/NARAL v. Johnson, 1999-NMSC-028, ¶ 6, 127 N.M. 654, 986 P.2d 450. The answer is that both are partly right. We will apply a de novo standard to Primetime's third issue and an abuse of discretion standard to the others.
{48} We start with the legal question and hold that neither our constitution nor Section 42A-1-25(A)(3) mandates attorney fees in inverse condemnation cases. Primetime does not cite to any cases-and we have found none-holding that attorney fees are mandated by constitutional takings provisions. The Florida Supreme Court opinion that Primetime relies on does not hold that attorney fees are required by Florida's constitution. The opinion pays homage to the spirit and letter of Florida's constitution and its idea of just compensation. Jacksonville Expressway Auth. v. Henry G. Dupree Co., 108 So.2d 289, 294 (Fla.1958), limited on other grounds by Fla. E. Coast Ry. Co. v. Martin County, 171 So.2d 873, 877 (1965). But the decision is actually grounded on statutory provisions allowing costs to owners in condemnation actions. "Costs" had previously been interpreted to include attorney's fees. Id. at 294-95. We have no comparable cases in New Mexico, except for Landavazo, and Landavazo is not grounded on constitutional mandate. 111 N.M. at 138, 802 P.2d at 1284.
{49} Should we, then, expand Landavazo and hold that Section 42A-1-25(A)(3) supports *1100 a rule that attorney fees are presumptively appropriate in all inverse condemnation cases? Our response is: No. The language of Section 42A-1-25(A)(3) does not require it. That section provides:
A. The court shall award the condemnee his litigation expenses whenever:
. . . .
(3) there is a final determination that the condemnor does not have a right to take the property sought to be acquired in the condemnation proceeding.
{50} In a sharply divided opinion, the majority in Landavazo construed the phrase "`does not have a right'" in inverse condemnation cases to mean "that the condemning authority has proceeded wrongfully in taking the landowner's property without paying or offering just compensation." 111 N.M. at 142, 802 P.2d at 1288. The Court felt that this construction would protect landowners from abuse and would require-or encourage-entities to proceed in an orderly fashion by direct condemnation.
{51} The Court's decision was informed by the facts in Landavazo. There the county widened a roadway and in the process stripped away almost 20,000 square feet of the plaintiff's farmland. Id. at 141, 802 P.2d at 1287. The county did not ask permission to invade the owner's property and did not make any effort to proceed under the Eminent Domain Code before or after the taking. Id. When the landowner protested the action, the landowner apparently was told that "if he did not agree with the county's actions, he could `take it to court.'" Id. The Landavazo opinion illustrates a clear instance of aggravated and objectionable conduct by a governmental agency. As Landavazo points out, the county could have avoided the entire problem-including attorney fees-if it had simply followed procedures under the Eminent Domain Code. Id. at 141-42, 802 P.2d at 1287-88. Having literally forced the landowner to bring an inverse condemnation suit for relief, the Court felt that granting attorney fees was a reasonable way to compensate him for the county's wrongful conduct. Id. at 143, 802 P.2d at 1289.
{52} The Supreme Court's decision in Landavazo "that the county did not have the right to take the property," id., includes the implicit limit "in the way it did here." In this sense the aggravated circumstances present in Landavazo are an integral part of the decision. The absence of such aggravated circumstances argues against the expansion of the Landavazo rule to all inverse condemnation cases, and we decline to expand it in this case.
{53} The facts here are the polar opposite of those in Landavazo. There is no hint that the City deliberately misplaced its waterlines. We surmise that the City was just as surprised as Primetime to find the encroachment. If there was evidence of calculation or indifference on the part of the City, it would have been Primetime's burden to produce it and it did not. Further, it was not error or an abuse of discretion by the district court to allow evidence from the City that the misplacement some years earlier-before Primetime owned the property-was a mistake or inadvertent. The City's stipulation to liability did not act as a waiver of its ability to prove inadvertence if only because placement of the pipes and their removal were separated by so many years. The taking matured only when the pipes interfered with Primetime's use and possession. "The trial court has broad discretion when awarding attorney fees and will not be reversed unless there is an abuse of discretion." Hedicke v. Gunville, 2003-NMCA-032, ¶ 23, 133 N.M. 335, 62 P.3d 1217. There is no abuse of discretion here.
CONCLUSION
{54} We affirm the district court's measure of damages for excess construction costs with the exception of the cost of the buttress wall. We remand that portion of the award for reconsideration as to its reasonableness in light of the general award for lost rental value. We reverse the district court's award of lost profits and remand for reconsideration in accord with this opinion. We vacate the district court's grant of costs and affirm the denial of attorney fees. On remand, since the judge who decided this case is no longer on the bench, the judge to whom the case is assigned may exercise discretion to determine how much of the existing proceedings to review and how much new or revised *1101 material the parties may present on remand. See, e.g., Gomez v. Gomez, 119 N.M. 755, 756-57, 895 P.2d 277, 278-79 (Ct.App.1995), superseded by statute on other grounds as stated in Erickson v. Erickson, 1999-NMCA-056, ¶ 25, 127 N.M. 140, 978 P.2d 347; Smith v. Trailways, Inc., 103 N.M. 741, 748, 713 P.2d 557, 564 (Ct.App.1986).
{55} IT IS SO ORDERED.
WE CONCUR: LYNN PICKARD, and JAMES J. WECHSLER, Judges.